[S. F. No. 16006. In Bank.—September 27, 1938.]

AMERICAN TOLL BRIDGE COMPANY (a Corporation), Petitioner, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

188

Thelen & Marrin, Max Thelen, Dunn, White & Aiken, B. R. Aiken, Bauer E. Kramer, Breed, Burpee & Robinson and Harold C. Holmes, Jr., for Petitioner.

Ira H. Rowell, Roderick B. Cassidy and George E. Howard for Respondents.

C. C. Carleton, Chief Counsel, and C. R. Montgomery, Attorney, for Department of Public Works, as *Amici Curiae*, on behalf of Respondents.

THE COURT.—The purpose of this proceeding is to review an order of the Railroad Commission reducing the tolls for automobiles and passengers over the Carquinez bridge. The main question is whether the rates so fixed are so low as to be confiscatory. Other questions also require determination.

On February 5, 1923, the board of supervisors of Contra Costa County granted to the Rodeo-Vallejo Ferry Company a twenty-five year franchise to construct and operate the Carquinez bridge across Carquinez straits between Crockett in Contra Costa County and Valona in Solano County. On June 4, 1923, the same board of supervisors granted to Delta Bridge Corporation a twenty-five-year franchise to construct and operate a bridge across the San Joaquin River near Antioch, between the counties of Contra Costa and Sacramento. Both franchises expire in 1948, at which time the property rights and title in and to the bridges revert to the adjacent counties without the payment of compensation to the franchise holders.

Those in control of the Rodeo-Vallejo Ferry Company organized the American Toll Bridge Company which became the owner of the Carquinez bridge franchise on July 2, 1923. That company also acquired the franchise to construct and operate the Antioch bridge as well as all of the outstanding stock of the Rodeo-Vallejo Ferry Company and of the Martinez-Benicia Ferry and Transportation Company which operates ferries between Martinez and Benicia. The Antioch bridge was opened to traffic in January, 1926, and the Carquinez bridge in May, 1927. The Antioch bridge crosses the stream at a point 25 miles above and east of the Carquinez bridge. Between the two bridges, about eight miles east of the Carquinez bridge, the ferry boats owned by the American Toll Bridge Company ply between the two shores.

The power and duty of granting authority to construct and operate a toll bridge over water dividing two counties and to fix the tolls to be collected for the use thereof formerly resided in the board of supervisors of the county situate on

the left bank descending the stream or arm of the bay. (Pol. Code, secs. 2843, 2845.) The board of supervisors of Contra Costa County, at the beginning of operations of the Carquinez bridge, fixed the tolls for automobiles at sixty cents and ten cents for passengers in vehicles or on foot. The bridge was in operation at this scale of tolls at the time of the reduction ordered by the commission.

By Statutes of 1937, page 2473, the jurisdiction of toll bridges was transferred to the Railroad Commission. On August 27, 1937, the commission on its own motion commenced in one proceeding the investigation of the tolls and affairs of all toll bridges which thus had come under its jurisdiction, including the Carquinez, the Antioch, the San Mateo and the Dumbarton bridges. Subsequently, on October 4, 1937, in a separate proceeding, the commission ordered an independent investigation into the reasonableness of the tolls charged upon the Carquinez bridge alone. After hearings and on February 8, 1938, the commission rendered its opinion and order establishing the tolls for automobiles at forty-five cents and five cents for each passenger in vehicles or on foot. The validity of this order is here called into question.

Notice is first taken of the contentions with respect to the scope of the review herein. In 1933 the legislature added the following paragraph to section 67 of the Public Utilities Act (Stats. 1933, p. 1157), referring to orders and decisions of the Railroad Commission: ''In any proceeding wherein the validity of any order or decision is challenged on the ground that it violates any right of petitioner under the Constitution of the United States, the Supreme Court shall exercise an independent judgment on the law and the facts, and the findings or conclusions of the commission material to the determination of the said constitutional question shall not be final.'' Otherwise the findings on questions of fact remained final.

The petitioner invokes section 1 of article IV and paragraph 1, section 10, article I, of the United States Constitution. It contends that this court's independent judgment as to all probative facts in the record must be exercised in determining whether the constitutional sections have been violated, and that the exercise of such independent judgment

will disclose the confiscatory nature of the tolls fixed by the commission.

This court has heretofore recognized that the enactment of the quoted provision in section 67 of the Public Utilities Act afforded an answer to the often repeated contention or criticism in the state and federal courts, with special reference to the case of *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287 [40 Sup. Ct. 527, 64 L. Ed. 908], that legislation providing for regulation of public utilities should accord a complaining party an opportunity to obtain in a judicial tribunal an independent review of the law and the facts when the order or decision of the commission is challenged on federal constitutional grounds. (*Southern California Edison Co.* v. *Railroad Commission,* 6 Cal. (2d) 737, 744 [59 Pac. (2d) 808].) It was our conclusion in that case that the ''amendment did not, in any substantial degree, change the rules in force prior thereto. The law of the state, both constitutional and statutory, before 1933 and as construed by this court, was at pains to preserve to the complaining party the right to challenge in this court any order or decision of the commission on federal constitutional grounds when, of course, such challenge could appropriately be made in the proceeding'', and that an answer to said challenge included an independent consideration of both the law and the facts ''even though the order of the court be a denial of an application for review''. We there cited numerous cases wherein this court, prior to 1933, decided that neither the provision of section 67 which makes findings and conclusions of the commission on questions of fact final and not subject to review, nor the nature of the review proceeding, precluded an independent investigation into the facts when federal constitutional objections were available to the complaining party, regardless of whether the action of the commission was *quasi*-judicial, or legislative as in the fixing of rates. The scope of the judicial review as bearing upon the question of the court's independent judgment in connection with the rate-making power within constitutional restraints was stated in *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 50–54 [56 Sup. Ct. 720, 80 L. Ed. 1033], as follows:

''The fixing of rates is a legislative act. In determining the scope of judicial review of that act, there is a distinction between action within the sphere of legislative authority and

action which transcends the limits of legislative power. Exercising its rate-making authority, the legislature has a broad discretion. It may exercise that authority directly, or through the agency it creates or appoints to act for that purpose in accordance with appropriate standards. The court does not sit as a board of revision to substitute its judgment for that of the legislature or its agents as to matters within the province of either. . . . (Citing cases.) . . . When the legislature itself acts within the broad field of legislative discretion, its determinations are conclusive. When the legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency, are met, as in according a fair hearing and acting upon evidence and not arbitrarily. . . . (Citing cases.) . . . In such cases, the judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings, and the question of the weight of the evidence in determining issues of fact lies with the legislative agency acting within its statutory authority.

"But the Constitution fixes limits to the rate-making power by prohibiting the deprivation of property without due process of law or the taking of private property for public use without just compensation. When the legislature acts directly, its action is subject to judicial scrutiny and determination in order to prevent the transgression of these limits of power. The legislature cannot preclude that scrutiny and determination by any declaration or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the Constitution as the supreme law of the land may be maintained. . . . But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. On the contrary, the judicial duty is performed in the light of the proceedings already had and may be greatly facilitated by the assembling and analysis of the facts in the course of the legislative determination. Judicial judgment may be none the less appropriately independent because informed and aided by the sifting procedure of an expert legislative agency.

Moreover, as the question is whether the legislative action has passed beyond the lowest limit of the permitted zone of reasonableness into the forbidden reaches of confiscation, judicial scrutiny must of necessity take into account the entire legislative process, including the reasoning and findings upon which the legislative action rests. We have said that 'in a question of rate-making there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing'. (*Darnell* v. *Edwards,* 224 U. S. 564, 569 [37 Sup. Ct. 701, 61 L. Ed. 1317].) The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established. (*Los Angeles Gas & Electric Corp.* v. *Railroad Commission,* 289 U. S. 287, 305 [53 Sup. Ct. 637, 77 L. Ed. 1180] ; *Lindheimer* v. *Illinois Telephone Co.,* 292 U. S. 151, 169 [54 Sup. Ct. 658, 78 L. Ed. 1182] ; *Dayton Power & Light Co.,* v. *Public Utilities Commission,* 292 U. S. 290, 298 [54 Sup. Ct. 647, 78 L. Ed. 1267].) . . . It follows, in the application of this principle, that as the ultimate determination whether or not rates are confiscatory ordinarily rests upon a variety of subordinate or primary findings of fact as to particular elements, such findings made by a legislative agency after hearing will not be disturbed save as in particular instances they are plainly shown to be overborne.''

And from *Los Angeles Gas Co.* v. *Railroad Com.,* 289 U. S. 287, 304 [53 Sup. Ct. 637, 77 L. Ed. 1180], we quote: ''We do not sit as a board of revision, but to enforce constitutional rights.. (*San Diego Land & Town Co.* v. *Jasper,* 189 U. S. 439, 446 [23 Sup. Ct. 571, 47 L. Ed. 892].) The legislative discretion implied in the rate-making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself. We are not concerned with either, so long as constitutional limitations are not transgressed. When the legislative method is disclosed, it may have a definite bearing upon the validity of the result reached, but the judicial function does not go beyond the decision of the constitutional question. That question is whether the rates as

fixed are confiscatory. And upon that question the complainant has the burden of proof and the court may not interfere with the exercise of the state's authority unless confiscation is clearly established." The court there also referred to *Minnesota Rate Cases, Simpson* v. *Shepard,* 230 U. S. 352, 452 [33 Sup. Ct. 729, 57 L. Ed. 1511, Ann. Cas. 1916A, 18, 48 L. R. A. (N. S.) 1151], quoting at page 307: " 'It is fundamental 'that the judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases.' "

The first constitutional objection advanced by the petitioner is that the reduction of the prevailing rates is an impairment of the contract obligation between the county of Contra Costa and the petitioner. It bases its contention on the provisions of section 2845, subdivision 3, and section 2846 of the Political Code, and its claim that the provisions of those sections were a part of the contract between the grantor and grantee of the franchise. Subdivision 3 of section 2845, as it read at the time the franchise was granted, required that the board of supervisors granting authority to construct a toll bridge must at the same time, "3. Fix the rate of tolls which may be collected for crossing the bridge or ferry, which must not raise annually an income exceeding fifteen per cent on the actual cost of construction or erection and maintenance of the bridge or ferry for the first year, nor on the fair cash value together with repairs and maintenance thereof for any succeeding year." Section 2846, enacted in 1872, reads: "The license tax and rate of toll fixed as provided in the preceding section must not be increased or diminished during the term of twenty years, at any time, unless it is shown to the satisfaction of the Board of Supervisors that the receipts from tolls in any one year is disproportionate to the cost of construction or erection, or the fair cash value thereof, together with the cost of all necessary repairs and maintenance of the bridge or ferry. . . . "

The petitioner construes the provisions of the foregoing sections, read together, as securing it against a reduction of the tolls during the specified period unless its net annual revenue exceeds fifteen per cent of the fair cash value. It may fairly be assumed from the evidence that the income in any year, after all deductions, has not equalled the designated fifteen per cent. Merit in the petitioner's contention de-

pends, however, on the propriety of reading into the language of the sections an intent on the part of the legislature to declare that receipts from tolls which return a net annual income of fifteen per cent "is not disproportionate" to the "fair cash value", and that it intended to encourage the investment of funds by guaranteeing such a return. This construction, however, fails to give full import to the language of the section which prohibits either an increase or a reduction in the tolls unless the receipts are shown to be disproportionate. The language contemplates increases as well as reductions at any time the disproportion is shown to exist, limited by the fifteen per cent maximum. Such language is inconsistent with any intent to enter into a contract that a fifteen per cent return will be assured to the grantee of the franchise, if the toll rate established produced that much. Rather is it to be assumed that the legislature intended, not only to afford an adequate and proportionate return to the grantee, but that it also intended some measure of protection to the public's right to be charged not more than a reasonable toll for the use of the bridge. Toll bridges in this state have been subject to legislative control since 1854. (*Newsom* v. *Board of Supervisors,* 205 Cal. 262, 266 [270 Pac. 676].) In 1872, when section 2846 was enacted by the legislature, sufficient scope was allowed between both interests, public and private, to permit adequate elasticity in the exercise of the legislative rate-making function in the light of prevailing economic conditions. Such a statute does not savor of a contract obligation to the grantee. Its object was to delegate to and vest in the designated body the power to regulate tolls as circumscribed by the stated limitation. The courts have recognized that this was, and that the creation of a contract obligation was not, the purpose and object of such statutes. Of a statutory provision permitting participation in the rate-making function by two representatives on the board of commissioners of the Spring Valley Water Company selected at the time of incorporation (later changed by section 1, article XIV of the Constitution vesting the rate-making power in the board of supervisors), it was said: "These things are not of the contract; they appertain to the sovereignty of the state, and can not be bargained away," citing *Munn* v. *Illinois,* 94 U. S. 113, 126 [24 L. Ed. 77].

The retention by the state of the power to regulate tolls was sustained where the statute involved provided for a legislative reservation to reduce the road tolls when it should appear that they produced an annual net dividend in excess of fourteen per cent, "so that it shall give that amount of net dividends per annum, and no more", and where by subsequent legislation rates which would produce a return less than that were specified. (*Covington & Lexington Turnpike Co.* v. *Sandford,* 164 U. S. 578 [17 Sup. Ct. 198, 41 L. Ed. 560].) The court supported its conclusion by the application of the principles relating to tax immunity statutes, including the doctrine that "all doubts upon the question must be resolved in favor of the public". It said: "The same principles should be recognized when the claim is of immunity or exemption from legislative control of tolls to be exacted by a corporation established by authority of law for the construction of a public highway. It is of the highest importance that such control should remain with the state, and it should never be implied that the legislative department intended to surrender it. Such an intention should not be imputed to the legislature if it be possible to avoid doing so by any reasonable interpretation of its statutes. It is as vital that the state should retain its control of tolls upon public highways as it is that it should not surrender or fetter its power of taxation." The court thereupon declared it to be the intention to pass to the new corporation, as successors of the original corporation, only the necessary powers, rights and capacities, and not any exemption from legitimate and ordinary legislative control. The same principle was later stated in the case of *Railroad Com.* v. *Los Angeles,* 280 U. S. 145, 152 [50 Sup. Ct. 71, 74 L. Ed. 234], as follows: "The delegation of authority to give up or suspend the power of rate regulation will not be found more readily than would an intention on the part of the State to authorize the bargaining away of its power to tax . . ." (Citing cases.) The principle is applicable in the present case to support the conclusion that the legislature did not create an immunity or exemption from the appropriate legislative control. ■ Any such ambiguity is resolved in favor of the retention of the power to regulate. (*Freeport Water Company* v. *Freeport City,* 180 U. S. 587, 599 [21

Sup. Ct. 493, 45 L. Ed. 679] ; *Stanislaus County* v. *San Joaquin C. & I. Co.*, 192 U. S. 201 [24 Sup. Ct. 241, 48 L. Ed. 406].) In the last cited case a statute of 1862 provided for water rates which should "not be reduced by the supervisors so low as to yield to the stockholders less than one and one-half per cent per month upon the capital actually invested". A statute of 1885 changed the figure so that the net annual receipts should "be no less than six nor more than eighteen per cent" upon the value of the property actually used and useful to the business of furnishing water. The Supreme Court held that the statute of 1862 did not amount to a contract, and that the state had by section 31 of article IV (now article XII, sec. 1), of its Constitution reserved the power subsequently to alter the authority vested by the earlier statute. It said that "as the contract, if it existed, would take away from the legislature its otherwise undoubted right of regulation upon a subject of great public importance, there is still less reason for implying a contract which would prevent the state from using its power to that end in the future."

The foregoing discloses the inapplicability of certain decisions relied on by the petitioner, such as *Detroit* v. *Detroit Citizen's St. Ry. Co.*, 184 U. S. 368 [22 Sup. Ct. 410, 46 L. Ed. 592], wherein the court recognized the competency of a state legislature in the absence of constitutional prohibition, to authorize a municipal corporation to make a binding contract as to rates of fare with a street railway company, as distinguished from a mere delegation of authority to regulate. Such cases would not justify a conclusion in the present case that the provisions of the statute herein amount to an irrevocable contract for a minimum annual percentage of return to the petitioner. ■ The power to contract, or the existence of a contract in such a case as distinguished from regulation, must be so clear as to be susceptible of no other construction. (*Home Tel. Co.* v. *Los Angeles*, 211 U. S. 265 [29 Sup. Ct. 50, 53 L. Ed. 176].) This disposes of the petitioner's contention that the provisions of the statute with reference to tolls became a part of the franchise contract, or of any imputation that, as part of the contract, they are subject to any construction which includes a relinquishment of the power of regulation. ■ By a parity of reasoning

and pursuant to the foregoing cited decisions, the provisions of the statute may not be regarded as a contract that the rate-making power will always be vested in the board of supervisors. The reservation of the power to repeal or alter the law (Const., art. IV, sec. 31, now art. XII, sec. 1), has been held to enter into the contract with the corporation. (*Stanislaus County* v. *San Joaquin C. & I. Co., supra,* p. 211; *Spring Valley Water Works* v. *Board of Supervisors,* 61 Cal. 2, 5; *Spring Valley Water Works* v. *Schottler,* 110 U. S. 347 [4 Sup. Ct. 48, 28 L. Ed. 173].)

The petitioner urges that the Carquinez and Antioch bridges serve the same territory and must be considered as integral parts of a single transportation system; therefore, that the commission exceeded its jurisdiction in prosecuting an investigation into and making its order and decision referable to the Carquinez bridge alone. The petitioner concedes that the bridges are to some degree competitive, and says that a reduction in the tolls of the Carquinez bridge will compel a reduction to the same level in the tolls of the Antioch bridge, as well as a reduction below that level of the tolls on the ferry line, which likewise is competitive. The fact that the bridges are competitive, together with a consideration of all the other relevant facts appearing, may be said to have justified the commission in concluding that they are not integrated into a single transportation system and that neither is used or useful in any service performed by the other. The Toll Bridge Company purchased and operated the competitive factors for the obvious purpose of reducing competition, and it has undoubtedly succeeded in accomplishing that end. It cannot expect more. In other words, it cannot hope, by purchasing non-money-making enterprises for the purpose of controlling competition, also to restrict the power of regulation in its own interests exclusively. The public interest as well as that of the corporation controlling the public toll highway must receive proper consideration. (*Covington & Lexington Turnpike Road Co.* v. *Sandford, supra,* 596, 597.) There is no established precedent or authority presented by the petitioner which calls for a declaration that under the facts of this case the Railroad Commission was compelled to treat the two bridges as integrated units. On the contrary it has been

held that less than the whole property owned by a public utility may be fixed as the appropriate unit for rate-making purposes. (*Wabash Valley Elec. Co.* v. *Young*, 287 U. S. 488 [53 Sup. Ct. 234, 77 L. Ed. 447]; *Gilchrist* v. *Interborough Rapid Transit Co.*, 279 U. S. 159 [49 Sup. Ct. 282, 73 L. Ed. 652].) The fact that the petitioner herein from the beginning of its operations kept but one set of books covering all transactions pertaining to both bridges does not conclude the matter in favor of its contention. The fact appeared in the Gilchrist case that the subway and elevated lines were treated in the accounts of the lessee of both lines as separate units. But that distinction would not justify the view that, had it appeared that they were treated as one unit, the conclusion would have been different. (See, also, *International Ry. Co.* v. *Prendergast*, 1 Fed. Supp. 623, citing additional authorities at page 626.) The condition existing in this case, namely, that neither the Carquinez bridge nor the Antioch bridge is to any degree used or useful in the public utility service and operation of the other, distinguishes it from the case of *Coney* v. *Broad River Power Co.*, 171 S. C. 377 [172 S. E. 437], relied upon by the petitioner. There the decision was that the commission in computing a rate base for tolls to be charged by the power company for furnishing electric energy, could not exclude from consideration the properties of the street railway system owned and operated by it. But that conclusion specifically depended on the fact there appearing that the functions were related and that all the properties were used or useful in the company's business of generating electricity and in its related business.

█ To what extent the single ownership of such competing units subserves the public welfare and protects the corelative rights and interests of the franchise holders and the public, is a question primarily for the commission to decide. Unless its decision has been unreasonable or arbitrary and may therefore be said to violate a constitutional right of the petitioner, the conclusion of the commission should not be disturbed. We find no departure from the recognized precepts upon which the petitioner may rely in the conclusion of the commission that the petitioner is not entitled to have the investment and operating expense of both bridges included in the rate base upon which to compute a toll for Carquinez bridge.

The next contention for discussion is that the rate ordered by the commission is confiscatory.

The opinion and order of the commission is dated February 8, 1938. It indicates that the commission was well aware of and considered the fact that the life of the franchise and the control of the properties will terminate in 1948 without compensation to the franchise holder, and that the operating properties must therefore be treated as a "wasting asset". It also appears that in fixing the tolls for the traffic over Carquinez bridge consideration was "given to the effect of such rates on the company as a whole".

The Toll Bridge Company was organized under the laws of Delaware in May, 1923, with a capital stock of $5,000,000, which was transferred to a holding company having a similar name. In 1925 it incurred a bonded debt of $4,500,000 of first mortgage seven per cent bonds and $2,000,000 of second mortgage eight per cent bonds maturing in 1945. By the middle of 1935 it had reduced its capital stock to $3,719,-593 plus $57,280 subject to reissue for contingencies, and had reduced its bonded indebtedness to $4,180,000. At that time it called in its outstanding bonds and effected a refunding thereof through an issue of $4,300,000 first mortgage bonds at five and one-half per cent (including the expense of the call and reissue), the principal of which in turn was reduced to $2,491,500 by October 31, 1937. The commission found that the company's accounts showed that the actual investment in the Carquinez bridge structure, exclusive of lands, amounted to $7,863,451, which, with land $66,835, and furniture and fixtures, $19,668, amounted to a total of $7,949,954. The company's earnings have been sufficient to enable it to set up a reserve for depreciation of $2,748,443 (accumulated on the six per cent sinking fund method based on operating life under the franchise designed to return the investment upon the termination of that period), and additional reserves of $1,055,313; and to accumulate a surplus which on October 31, 1937, amounted to $419,123.

The testimony of the witnesses varied as to the estimated reasonable cost of the structure, and cost to reproduce new. The various estimates as summarized in the findings and opinion of the commission are the following:

Book cost of bridge structure (Commission's witness Coleman) .......................... $7,863,451

Estimated reasonable cost of construction (Commismission's witness Mitchell).................. 6,877,318

Cost to reproduce new (Commission's witness Mitchell) .............................. 6,340,844

Original cost (Company's witnesses Gerwick and Ready):

    Bridge structure...................$7,863,451

    Land ...........................   66,835

    Furniture and fixtures.............   19,668   7,949,954

Adjusted original cost (Gerwick and Ready)...... 8,332,622

Reasonable historical cost (Gerwick and Ready)... 8,139,307

Reproduction cost new (Gerwick and Ready)..... 8,743,231

After consideration of all the figures presented, the commission adopted the reported original cost, namely, $7,949,954, as the reasonable rate base. The estimated percentage of future annual net return was computed on the assumption that the reduction in the toll would be to a flat rate of fifty cents for each car including five passengers, and five cents for additional passengers, which was the rate charged on the San Francisco-Oakland bay bridge. The commission found that that rate, computed on the probable increase in traffic induced by the rate reduction, would produce annual net receipts amounting to approximately seven and one-half per cent on the adopted base. It said: "A reduction in rates will stimulate the traffic over the bridge, although the extent, of course, cannot be estimated with exactitude. The results estimated for the 1938 revenue should produce a return of approximately 7.5% on the investment in the bridge structure. When tested upon the bases usually followed by the commission such a rate of return is reasonable for this particular company, considering the unusual circumstances under which its properties were constructed and have been and are operated. However, for the time being, in order that the company may be assured of financial stability and to guard against possible inaccuracies in the estimate of induced traffic, by reason of rate reductions, a rate slightly higher than that proposed should be authorized." Thereupon the rate of 45 cents per car and five cents for each passenger was designated by its order. The commission expressly reserved jurisdiction to "reopen this proceeding when ex-

perience has developed further data of traffic moving over the bridge under the proposed rates'', and to adjust freight and other rates which were not to be deemed approved.

It appears in the record that the following percentages of net income had been earned by the company during the preceding eleven years:

| Year | Capital | Per cent Return: |
|------|---------|------------------|
| 1927 | $7,106,337 | 8.62 |
| 1928 | 7,365,297 | 6.82 |
| 1929 | 7,544,361 | 8.20 |
| 1930 | 7,777,981 | 9.50 |
| 1931 | 7,946,753 | 8.18 |
| 1932 | 7,954,819 | 6.42 |
| 1933 | 7,950,995 | 5.86 |
| 1934 | 7,946,464 | 6.84 |
| 1935 | 7,946,068 | 7.42 |
| 1936 | 7,947,411 | 10.89 |
| 1937 | 7,947,537 | 12.12 |

These net rates of return, as well as the estimated future net percentage of return found by the commission, do not include and are not the source of the accumulated reserves for the repayment of the full investment by the end of the franchise term. Those rates of return are in addition to the amounts set aside for the return of investment, and represent the investor's annual reward for the use of capital.

The petitioner urges that account should have been taken of the fact that prior to 1935 the company paid no stock dividends and that a rate should have been fixed which would enable the company to earn sufficient to return to the stockholders dividends undeclared and assertedly unearned in the past. But past deficits may not be included in the computation of the base for toll regulating purposes. ''Deficits in the past do not afford a legal basis for invalidating rates, otherwise compensatory, any more than past profits can be used to sustain confiscatory rates for the future. (*Board of Commissioners* v. *New York Telephone Co.,* 271 U. S. 23, 31, 32 [46 Sup. Ct. 363, 70 L. Ed. 808].)'' (*Los Angeles Gas & Elec. Co.* v. *Railroad Com.,* 289 U. S. 287, 313 [53 Sup. Ct. 637, 77 L. Ed. 1180]. See, also, *International Ry. Co.* v. *Prendergast,* 1 Fed. Supp. 623, 630.)

The petitioner does not dispute the reasonableness of adopting the reported original cost as a rate base, nor the correctness of the commission's finding as to the amount thereof except that it contends that two items estimated by it should have been included or added thereto, namely, an allowance for cost of developing the business, or going concern value; and an allowance representing additional cost of interest during construction. The petitioner states that the commission allowed the reported actual expenditure of $688,092.56, and no more, as interest during construction; that capital funds in the sum of $1,377,522 derived from stock sales and advances by Rodeo-Vallejo Ferry Company, were expended for construction purposes prior to the time when the bond money became available, and that the interest item should be increased to $1,070,761. It is therefore contended that the sum of $382,688 should be added to the adopted rate base as partial cost of money during construction, although at the same time it is conceded that the petitioner's accounts do not show the actual expenditure thereof.

The petitioner computes the going concern value at $300,000, which it also contends should be added to the rate base figures of $7,949,954. It arrives at that estimate by fixing nine per cent as the cost of money, and taking ''for the first five years of operation the very low figure of the deficiency of the income of the Carquinez bridge below the 9% cost of money shown by the evidence, with interest, the result is the sum of approximately $300,000.00'' which represents ''5% of the cost of reproducing new the physical property, before consideration is given to overheads and is most reasonable under any accepted standard''.

The addition to the rate base of these claimed omitted allowances produces a total of $8,632,622, which the company proffers as the correct rate base. The petitioner urges that the estimated future net income from Carquinez bridge traffic will return but 6.6 per cent to the stockholders, computed on the adjusted base, which, it argues, considering all the factors and elements which have made the risk adventurous, not to say hazardous, is so low as to be confiscatory. One of the elements relied upon is the alleged higher cost of money to the company, which it places between nine and ten per cent. It urges that the net annual return should be equal at least to that cost.

The items for going concern value and additional money cost during construction are not shown, nor claimed, to have been actually incurred or expended, but are hypothetical allowances, and perhaps adjustable for acceptance and inclusion in estimates representing reproduction cost new. It is stated in the commission's opinion that "the book figures include certain expenditures for organization purposes whose reasonableness might well be questioned". In adopting the rate base those expenditures were nevertheless permitted to remain. Under any method of computation which the commission might pursue based on the various estimates before it, it does not appear that it would have arrived at a higher figure, even including appropriately adjusted allowances for the hypothetical costs claimed by the petitioner. The petitioner has not shown any error or arbitrary action on the part of the commission in not adding to the base figure of the two hypothetical costs. The commission has therefore allowed all that could be required of it in respect to those items. (cf. *Wabash Valley Elec. Co.* v. *Young*, 287 U. S. 488, 500 [53 Sup. Ct. 234, 77 L. Ed. 447].)

In connection with the claimed item for going concern value, we should also note that there was not here encountered the complexity of starting a new utility whose service was the sale and distribution of a commodity, such as electrical energy, gas or water, which required the intricate balancing of innumerable costs in many departments in order to become established as a going concern. Compared to the services performed by such utilities the establishment of the operation of a toll bridge may be considered a fairly simplified task. The commission was fully justified in concluding that there existed here no such impressive features influencing the intangible element of value known as going concern as were referred to or enumerated in cases relied upon by the petitioner (see *McCardle* v. *Indianapolis Co.*, 272 U. S. 400 [47 Sup. Ct. 144, 71 L. Ed. 316]; *Los Angeles Gas Corp.* v. *Railroad Com.*, 289 U. S. 287, 313 [53 Sup. Ct. 637, 77 L. Ed. 1180]; *International Ry. Co.* v. *Prendergast*, 1 Fed. Supp. 623, 629), and that that element of value was given complete recognition by adopting the company's own record of the actual cost thereof. The commission's finding on this item is fully supported by *Dayton Power & Light Co.* v. *Public Utilities Com. of Ohio*, 292 U. S. 290 [54 Sup. Ct. 647, 78

L. Ed. 1267], wherein the court recognized that "going value is not something to be read into every balance sheet as a perfunctory addition. 'It calls for consideration of the history and circumstances of the particular enterprise' . . . ", citing *Los Angeles Gas & Elec. Corp.* v. *Railroad Com. of California, supra,* at page 314. Continuing the court said: "Here the company was a small one and its organization simple. There was no diversified and complex business with ramifying subdivisions. We cannot in fairness say that after valuing the assets upon the basis of a plan in successful operation, there was left an element of going value to be added to the total. Even if the addition might have been made without departure from accepted principles, the omission to make it does not appear to have been so unreasonable or arbitrary as to overleap discretion and reach the zone of confiscation. 'It is necessary again, in this relation, to distinguish between the legislative and judicial functions.' (Los Angeles case, *supra,* p. 314.) Much that the framers of a schedule are at liberty to do, this court in the exercise of its supervisory jurisdiction may not require them to do. For the legislative process, at least equally with the judicial, there is an indeterminate penumbra within which choice is uncontrolled."

Further sustaining authority is found in *Columbus Gas & Fuel Co.* v. *Public Utilities Com. of Ohio,* 292 U. S. 398, 411–413 [54 Sup. Ct. 763, 78 L. Ed. 1327, 91 A. L. R. 1403], wherein objection to a disallowance of a going concern value was rejected when it appeared that such actual cost was nominal because of absence of competition and had actually been included as part of the cost of operation.

The historical hazards and risks stressed by the petitioner were unquestionably taken into consideration by the commission and are reflected in the rate base adopted. The special "wasting asset" character of the physical properties was also duly considered, and in computing the net annual receipts, allowances were made for depreciation reserves, including amortization of the entire investment before the expiration of the franchise period. Volume of traffic and consequently net returns have been increasing and tending steadily upward since 1933 and undoubtedly will continue to do so because of the increase in the traffic due to the operation of the bay bridge. It is therefore apparent that the com-

mission has given due weight and consideration to all relevant facts and criteria in arriving at a proper base upon which it estimated the probable future net return. Considering the company "as a whole", with all the particular elements and factors bearing upon the question, we conclude that the method adopted by the commission in arriving at the value of the property for rate regulatory purposes is not shown to have been unlawful. And taking into consideration all of the factors which influenced the decision of the commission, as disclosed by the record, it cannot be said that adequate return has not been afforded to the petitioner.

Nor are we persuaded that the petitioner is entitled as a matter of right to a percentage of net return equal to what it claims is the cost of money to it. The stated percentage of money cost might historically be considered correct, but it relates to a period antedating 1935 when the company's bonded indebtedness was refunded. Here again, however, the petitioner may not be sustained in its claim of right to recoup past losses or expenses in its financing experiences. A glance at the figures of the present bond issue, the principal of which includes the expenses incurred in calling in the original issue and in issuing the new bonds, sufficiently indicates that the percentage claimed is not the measure of today's needs.

If time and experience prove that the expectations of the commission based on the percentage of anticipated increase in traffic induced by the reduction in rates, as computed by witnesses, fall short of realization, the petitioner will still be protected by an adjustment to be effected by the commission in the exercise of its reserved jurisdiction.

The petitioner claims that the commission erred in computing the net revenue upon which it estimated the percentage of return. The only claimed error in this computation is the allowance by the commission of income taxes on an accrual basis, rather than on the basis of actual expenditure in the base year. The contention is that the commission should have deducted income taxes, computed not on the income for the corresponding year, but on the income for the preceding year, on the theory that allowance should be made for the amount which is paid in the base year, rather than the amount accrued against the income of that year. We know of no practice or precedent in rate regulation which

supports the theory of the petitioner, and it has presented none. We perceive no error in the method of accounting which treats the income tax item on an accrual basis for the purpose of arriving at net income for rate regulatory purposes.

The petitioner finally urges that the commission's findings, its conduct of the hearing, and the making of the order were not in accord with the principles of due process as reiterated and applied in the recent case of *Morgan* v. *United States*, 304 U. S. 1 [58 Sup. Ct. 773, 82 L. Ed. 1129]. In this connection it specifies that the separation of the properties of the Carquinez and Antioch bridges for rate regulatory purposes is against the "rudimentary requirements of fair play" and does not supply "those fundamental requirements of fairness which are the essence of due process in a proceeding of a judicial nature", mentioned in that case. The preceding discussion we think fully answers those contentions. Nothing appears which justifies a conclusion that all the essentials of a full and fair hearing before the Railroad Commission were not accorded the petitioner in compliance with the requirements of the constitutional mandate. The findings of fact, while not given numerical segregation, are stated with sufficient fullness in the opinion of the commission to apprise the parties and this court of all the facts supporting the commission's decision.     Opportunity to examine and object to proposed findings before the decision was rendered was not essential. The number and complexity of findings, a lack of opportunity to examine which in the Morgan case evoked criticism, were not here present. The petitioner made its objections in a petition for rehearing filed with the commission, which was denied.

The rest of the petitioner's specified particulars of omission or commission in the matter of the procedure and conduct of the hearing before the commission relate to the procedure of defining the issues upon which evidence was received. It is not contended that the petitioner was not fairly informed of what the issues were to be or that the issues were not clearly defined and understood by all parties concerned during the course of the hearing. As stated in the still more recent case of *National Labor Relations Board* v. *Mackay Radio & Tel. Co.*, 304 U. S. 333 [58 Sup. Ct. 904, at 913, 82 L. Ed. 1381], "as no other detriment or disadvantage is claimed to have ensued from the board's procedure the matter is not

one calling for a reversal of the order. The Fifth Amendment guarantees no particular form of procedure; it protects substantial rights. Compare *Morgan* v. *United States*, 298 U. S. 468 [56 Sup. Ct. 906, 80 L. Ed. 1288]''. On its denial of a petition for rehearing in *Morgan* v. *United States, supra,* the Supreme Court again adverted to the distinction thus made in the Mackay Radio case. We conclude that the procedure followed in the present matter has not infringed upon the rights of the petitioner vouchsafed to it by the state and federal Constitutions.

The order of the commission is affirmed. The order of this court directing a stay pending determination in this proceeding is discharged.

Rehearing denied.