[Civ. No. 46245. First Dist., Div. Two. Nov. 2, 1982.]

LOUISIANA-PACIFIC CORPORATION, Plaintiff and Appellant, v. HUMBOLDT BAY MUNICIPAL WATER DISTRICT et al., Defendants and Respondents.

CROWN SIMPSON CORPORATION, Plaintiff and Appellant, v. HUMBOLDT BAY MUNICIPAL WATER DISTRICT et al., Defendants and Respondents.

COUNSEL

Paul R. Haerle, James B. DeGolia, Mary Jo Sherlin, Thelen, Marrin, Johnson & Bridges, Pillsbury, Madison & Sutro, Walter R. Allan, Donald J. Putterman-Crigger, Janssen, Malloy & Marchi and Clayton R. Janssen for Plaintiffs and Appellants.

Richard B. McDonough, Donald T. Ramsey and Carroll, Burdick & McDonough for Defendants and Respondents.

■■■■■■■■■■■■■■■■

OPINION

**MILLER, J.**—In this action we consider whether a municipal water district can unilaterally abrogate selected provisions of its contracts by declaring, 18 years after the first contract was executed, that its statutory power to enter into contracts does not include the power to contract with respect to rates.

The action was submitted to the trial court upon stipulated facts which may be summarized as follows: The Humboldt Bay Municipal Water District (hereinafter District) was formed in November 1956 pursuant to the Municipal Water District Act of 1911, Water Code section 71000 et seq. One of the express intents and purposes of the formation was to induce Louisiana-Pacific Corporation and Crown-Simpson Corporation (hereinafter appellants) to locate their pulp mills within the District's boundaries. At the time of the 1956 election, the voters of Humboldt County understood that the assurance of a water supply to appellants was a means of inducing appellants to locate their mills in Humboldt County.

In accordance with the express purpose of inducing appellants to locate within its territory, District entered into separate agreements (hereinafter First Agreement) with appellants on September 8, 1959. The First Agreement obligated District to sell and appellants to purchase a minimum quantity of water, subject to availability, at a price set in the agreement. A sliding scale was set for water sold in excess of the minimum quantities. The prices were subject to adjustment to reflect any differences between estimated and actual costs of construction of District's facilities and, in fact, the stated prices were increased by 20 percent. In addition, 15 percent of appellants' payments was subject to further annual adjustments based on changes in the index of wholesale prices. By its terms, the First Agreement was to expire on December 31, 1999.

On February 23, 1966, appellants and District entered into agreements for supplemental water volumes (hereinafter Second Agreement). That agreement provided for a sale of additional water, reducible at District's discretion to supply other customers. The Second Agreement contemplated that District would construct additional facilities and it related payments for the additional water to be provided to District's actual or estimated costs for the additional facilities. In order to accomplish this, the agreement established a "Contract Price," to be calculated each year, which was to be the sum of four "Price Factors."[1]

---

[1] The "Price Factors" were as follows: 1) Payments of the principal and interest on bonds due and owing during each year. (Each appellant paid one half.) 2) $105,820, less a possible credit, toward District's fixed expenses for existing facilities. 3) Eleven seventy-fifths (11/75ths) of District's annual operating expenses. 4) The actual cost of electric power required to deliver water under the second agreement.

On January 28, 1975, appellants and District entered into another agreement (hereinafter Third Agreement) after it became apparent that existing facilities were incapable of providing the amount of water desired. The Third Agreement provided for modifications in the facilities together with an adjustment of the prices for water.[2]

For nearly 18 years all the parties operated under and relied on each of these agreements; nobody challenged the validity of any of the agreements in whole or in part.

However, on April 14, 1977, the board of directors of District passed a resolution directing the general manager to prepare an ordinance embodying a new rate schedule applicable to all District's customers. The resolution was based on the opinion of the board of directors that existing contract provisions that established the price of water to customers constituted an invalid limitation on the power of the board to set rates. On this basis, the board declared that it did not consider itself bound by the rate provisions of any of its municipal or industrial contracts.

Pursuant to this resolution, ordinance No. 10 was passed by the board on July 14, 1977. The ordinance established a new rate structure which purported ". . . to supersede only those portions of preexisting contracts with the District's municipal and industrial customers which establish rates and charges for water."

In September 1977, each appellant filed a complaint for declaratory relief. The cases were consolidated and, on the basis of the parties' factual stipulation and briefs, the court concluded that:

1) District "was not empowered to enter into the long term contracts" in question and "could not surrender the duties and powers delegated to it by the California Legislature in § 71616 of the Water Code."

2) District was not estopped from setting rates different from those established by the contracts.

3) District could not "surrender" rate-making power by any long term contract in general or the long term contracts relied upon by appellants.

---

[2]The third price factor of the Second Agreement was made subject to adjustment to reflect changes in the Building Cost Index prepared by Engineering News-Record. The fourth price factor was altered so as to give the District the benefit of savings resulting from the lower power requirements of the contemplated new facilities.

4) Appellants were not entitled to recover any sums paid by them pursuant to rates assessed by District.

The trial court's conclusions appear to be based on the rationale that the specific code provision (Wat. Code, § 71616) mandates a municipal water district to fix rates and thus conflicts with the general code provision permitting a district to make contracts (Wat. Code, § 71592), at least with respect to rates. Therefore, according to rules of statutory construction, the specific controls over the general.

On appeal appellants' primary argument is that District is empowered by statute to enter binding contracts and there is no basis for inferring that contracts may not be the vehicle by which the District establishes rates. We agree with appellants' position and reverse the judgment accordingly.

"In the construction of a statute, . . . it is a cardinal rule that all parts are to be construed with reference to each other, and when a conflict appears, the general provisions yield to those specific. *This rule is invoked, however, only where there is an apparent lack of harmony between the provisions. Its effect is not to isolate parts and attempt to build up a conflict which in fact does not exist.*" (*J. Breuner Co.* v. *Western Union Tel. Co.* (1930) 108 Cal.App. 243, 253 [291 P. 445], italics supplied; see also, Code Civ. Proc., § 1858; *In re Ricky H.* (1981) 30 Cal.3d 176, 187 [178 Cal.Rptr. 324, 636 P.2d 13]; *In re Bandmann* (1958) 51 Cal.2d 388, 393 [333 P.2d 339]; *Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 232 [273 P.2d 5]; 2A Sutherland, Statutory Construction (4th ed. 1973) § 46.05, pp. 56-57.) Similarly, statutes in pari materia, although in apparent conflict, should be construed to be in harmony with each other so far as reasonably possible. (*Boyd* v. *Huntington* (1932) 215 Cal. 473, 482 [11 P.2d 383]; *Ramos* v. *City of Santa Clara* (1973) 35 Cal.App.3d 93, 97 [110 Cal.Rptr. 485]; 2A Sutherland, Statutory Construction (4th ed. 1973) § 51.02, p. 290.) In *Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 965 [131 Cal.Rptr. 172], this court reiterated the established rule: "Broadly speaking, a specific provision relating to a particular subject will govern in respect to that subject as against the general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provisions relate. [Citation.] However, it is well settled that the statutes and codes blend into each other, and are to be regarded as constituting but a single statute. [Citation.] One should seek to consider the statutes not as antagonistic laws but as parts of the whole system which must be harmonized and effect given to every section. [Citations.] Accordingly, statutes which are in *pari materia* should be read together and harmonized if possible. Even when one statute merely deals generally with a particular subject while the other legislates specially upon the

same subject with greater detail and particularity, the two should be reconciled and construed so as to uphold both of them if it is reasonably possible to do so. [Citations.]"

In the instant action, part 5 of the Water Code sections[3] pertaining to municipal water districts is entitled "Powers and Purposes." Chapter 1 of part 5 is entitled "Powers Generally." Appearing under chapter 1 is section 71590 which provides: "A district may exercise the powers which are expressly granted by this division or are necessarily implied." Also included under chapter 1 is section 71592 which states: "A district may make contracts, employ labor, and do all acts necessary for the full exercise of its powers." Based on these two sections appellants contend that District can not only make contracts but may establish rates by way of contract.

On the other hand, chapter 2 of part 5 is entitled "Water." Article 1 under chapter 2 dealing with "Development and Sale" includes section 71616 which provides as follows:

"A district, so far as practicable, shall fix such rates for water in the district, and in each improvement district therein, as will result in revenues which will:

"(a) Pay the operating expenses of the district and the improvement district.

"(b) Provide for repairs and depreciation of works.

"(c) Provide for a reasonable surplus for improvements, extensions, and enlargements.

"(d) Pay the interest on any bonded debt.

"(e) Provide a sinking or other fund for the payment of the principal of such bonded debt as it becomes due.

"(f) Repay advances, together with interest at a rate not to exceed the interest value of money to the district, made from the district to an improvement district."

In his notice of intended decision the trial court took the position that rate fixing responsibility is vested in District's board of directors and "[n]o where in the law is a section which empowers the Board to enter into a long term contract for the sale of water by which the rates for water sold are not only frozen but

---

[3]All parts, chapters and sections will refer to the Water Code unless otherwise indicated.

are fixed without regard to the legal criteria set forth in Water Code Section 71616." The analysis is incorrect.

Rather than strain to find a conflict, the court below should have considered all relevant statutes in order to determine if they could be consistently applied. Secton 71614 which also appears under chapter 2, article 1, declares in part: "A district *may* fix the rates at which water shall be sold." (Italics supplied.) The statute is clearly discretionary; while it invests the district with power to regulate rates, it does not require that the district do so in every case. When the permissive nature of section 71614 is coupled with the qualifying "so far as practicable" phraseology of section 71616, it is evident that they are not in conflict with section 71592.

This analysis is reinforced when one considers the legislative history of the relevant statutes. The original water district law was enacted in the regular and extra session of the state Legislature in 1911. (Stats. 1911, ch. 671, p. 1290 et seq. amended by Stats. 1911, Ex. Sess., ch. 19, p. 92, et seq.) In both the original and amended law of 1911 section 12 provided: "Any municipal water district incorporated as herein provided, shall have power: . . . 10. To make contracts, to employ labor, and do all acts necessary for the full exercise of the foregoing powers." Section 20 of the amended law provided: "The board of directors *shall* fix all water rates and through the general manager collect the charges for the sale and distribution of water to all consumers." (Italics supplied.) Section 22 of the 1911 amendment provided: "The board of directors in the furnishing of water *shall* fix such rate as will pay the operating expenses of the district, provide for repairs and depreciation of works owned or operated by it, pay the interest on any bonded debt, and, so far as possible, provide a sinking or other fund for the payment of the principal of such debt as it may become due; it being the intention of this section to require the district to pay the interest and principal of its bonded debt from the revenues of the district." (Italics supplied.)

Wholesale amendments were made to water district law in 1951. (Stats. 1951, ch. 62, p. 183 et seq.) Section 12, paragraph 10 of the original act remained the same. However, section 20 was repealed and section 13 was amended to state inter alia: "The board of directors shall have power: . . . (8) To fix the rates at which water shall be sold, and to establish different rates for different classes or conditions of service; provided, that rates shall be uniform for like classes or conditions of service throughout the district, . . . " Section 22 was amended to read as follows: "The board of directors, *so far as practicable,* shall fix such rate or rates for water as will result in revenues which will pay the operating expenses of the district, provide for repairs and depreciation of works owned or operated·by the district, and provide a reasonable surplus for im-

provements, extensions and enlargements, pay the interest on any bonded debt of the district, and provide a sinking or other fund for the payment of the principal of such debt as it may become due." (Italics supplied.) Section 22 was amended in 1955, but the amendment was without significance for our analysis.

In 1963, an act revising and consolidating the law relating to municipal water districts was passed. (Stats. 1963, ch. 156, p. 823 et seq.) The act created the current code sections with which we are presently concerned. With the exception of the addition of subdivision (f) to section 71616 in 1969, all pertinent code sections have remained unchanged.

■ Where changes have been introduced to a statute by amendment it must be assumed the changes have a purpose; by substantially amending a statute the Legislature demonstrates an intent to change the preexisting law in all areas where there is a material change in the language of the act. (*People* v. *Perkins* (1951) 37 Cal.2d 62, 64 [230 P.2d 353]; *People* v. *Weitzel* (1927) 201 Cal. 116, 118 [255 P. 792, 52 A.L.R. 811]; *People* v. *Moreland* (1978) 81 Cal.App.3d 11, 19 [146 Cal.Rptr. 118].) ■ In 1911, water district law unequivocally stated that the district's board of directors shall fix all water rates. In 1951, the rate making provision was changed to provide that the board of directors shall have power to fix rates. Finally, in 1963, the rate provision stated that the district may fix rates. Thus, it is clear from the history of water district law that what may have been characterized as a mandatory authority to set rates in 1911 has evolved into merely discretionary power. We necessarily conclude that since section 71614's power to fix rates is discretionary and section 71616's mandate is qualified by the language "so far as practicable" the two statutes do not conflict with, let alone supersede, section 71592's express authority to contract.

Citing primarily *Home Telephone Co.* v. *Los Angeles* (1908) 211 U.S. 265 [53 L.Ed. 176, 29 S.Ct. 50] and *American Toll Bridge Co.* v. *Railroad Com.* (1938) 12 Cal.2d 184 [83 P.2d 1], respondent maintains that the fixing of rates is a legislative act and, absent legislative authority that empowers the district to renounce or surrender its duty to fix rates, contract rate provisions are void.

In *Home,* plaintiff filed suit to restrain the enforcement of certain ordinances which fixed the rate to be charged for telephone service in Los Angeles. Plaintiff contended that pursuant to a contract between it and the city it could maintain the charges for service at a specified standard, and that, as the rates prescribed by ordinance were less than that standard, the ordinance impaired the obligation of the contract. In discussing the applicable rules, the United States Supreme Court stated that the state "may authorize one of its municipal corporations to establish, by an inviolable contract the rates to be charged by a

public service corporation (or natural person) for a definite term, not grossly unreasonable in point of time, and that the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating the rates. [Citations.] But for the very reason that such a contract has the effect of extinguishing *pro tanto* an undoubted power of government, both its existence and the authority to make it must clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power. [Citations.] It is obvious that no case, unless it is identical in its facts, can serve as a controlling precedent for another, for differences, slight in themselves, may, through their relation with other facts, turn the balance one way or the other." (*Home Telephone Co.* v. *Los Angeles, supra,* 211 U.S. 265, 273-274 [53 L.Ed. 176, 182-183].) The applicable city charter in *Home* provided that the city council " 'shall have power, by ordinance, . . . to regulate telephone service, and the use of telephones within the city, and to fix and determine the charges for telephones and telephone service, . . .' " (Pp. 270-271 [53 L.Ed.2d, p. 181].) The court construed the charter provision as giving the council the power, by ordinance, to fix and determine charges, and nothing else: The court could find no other charter provision that could possibly authorize rate setting by contract.

In *American Toll Bridge,* our State Supreme Court reiterated the *Home* rule: "The power to contract, or the existence of a contract in such a case as distinguished from regulation, must be so clear as to be susceptible of no other construction." (12 Cal.2d at p. 197.)

In *Public Service Co.* v. *St. Cloud* (1924) 265 U.S. 352 [68 L.Ed. 1050, 44 S.Ct. 492], the plaintiff public service corporation had entered into a contract to provide gas to the defendant city at a rate of $1.35 per thousand cubic feet. Alleging that that rate resulted in a constant loss and steadily increasing operating deficit, plaintiff announced its intention to raise its rates, and sought to enjoin the city from interfering with that increase. Relying on state statutes[4] quite similar to the statutes at issue here, the court held that the contract was validly entered into and was binding on both parties.

The court commenced its discussion with the principle that "where a public service corporation and the municipality have power to contract as to rates, and exert that power by fixing the rates to govern during a particular time, the enforcement of such rates is controlled by the obligation resulting from the contract." (*Public Service Co.* v. *St. Cloud, supra,* 265 U.S. 352, 355 [68 L.Ed.2d

---

[4]One statute provided that the city " 'shall be capable of contracting and being contracted with; . . .' " The other provided " 'that the common council shall have authority to regulate and prescribe the fees and rates and charges of any and all companies hereinbefore mentioned.' " (265 U.S. at pp. 356-357 [68 L.Ed. at p. 1054].)

1050, 1054].) The court concluded that the subject statutes conferred upon the city the power to set rates by either contract or regulation: "[W]e think that the City might either contract as to the rates, as an incident to its power of granting the right to construct and operate the public utility, or, if it did not exercise this power to contract, might thereafter 'regulate and prescribe' the rates in the exercise of the governmental authority conferred by the proviso. One power, however, is not destructive of the other. *And where a municipality has both the power to contract as to rates and also the power to prescribe rates from time to time, if it exercises the power to contract, its power to regulate the rates during the period of the contract is thereby suspended, and the contract is binding."* (*Id.,* at pp. 359-360 [68 L.Ed.2d at p. 1055-1056], italics supplied.) The *St. Cloud* court explicitly distinguished *Home* on the grounds that in *Home* there was no provision authorizing the city to contract as to rates.

More recently, in *Trans World Airlines* v. *City & County of San Francisco* (9th Cir. 1955) 228 F.2d 473, San Francisco, acting under a state statute which granted it the power to contract and to lease,[5] entered into a 20-year contract which established the rates for use of space and facilities at the San Francisco Airport. Later, the city sought to alter those rates by exercising the rate-making power of its public utilities commission. The court held it could not do so: "Where . . . the municipality enters into a contract pursuant to express statutory authority to contract, the courts have recognized that the specific authority to contract, insofar as this authority conflicts with the general power conferred on the municipality to regulate public utility rates, should prevail." (*Id.,* at p. 477.)

In the case at bench, we have already concluded that while in the original water district law rate fixing power of the district was mandatory, current provisions for rate fixing are discretionary. Moreover, a district's power to contract is expressly stated in section 71592. Accordingly, water districts presently have the power to either regulate or contract as to rates. With coextensive powers, a district's power to contract may not be superseded by regulation.

Nothing in respondent's cited cases contradicts this holding. The decision in *Danley* v. *Merced Irr. Dist.* (1924) 66 Cal.App. 97 [226 P. 847, 854] to the ef-

---

[5]Section 4 of the Municipal and County Airport Law, Statutes 1927, chapter 267, page 485, which was in force at the time of contracting provided in pertinent part: "In connection with the erection or maintenance of any such airport or airports, or air navigation facilities, any such city and county . . . or any municipal corporation, shall have the power and jurisdiction . . . to lease or assign for operation such space or area, appurtenances, appliances or other conveniences necessary or useful in connection therewith . . . to enter into contracts or otherwise cooperate with the federal government or other public or private agencies, and otherwise exercise such powers as may be required or convenient in the promotion of aeronautics and the furtherance of commerce and navigation by air."

fect that an irrigation district could not waive its right to establish water rates by contract was based on an analysis of the 1911 statute (Stats. 1911, ch. 317, p. 516) which mandated the board of directors of irrigation districts to either levy assessments or to fix rates.

As pointed out by appellants, the parallels between the *Trans World Airlines* case and the instant action are striking and reinforce the decision of this court. In both cases, the municipalities were granted the broad power to enter into contract. The municipalities were motivated to enter into long-term contracts in order to induce the private contracting parties to locate within their jurisdiction and thus to supply a guaranteed source of revenue. As an appellate court has noted with respect to the *Trans World Airlines* case:

"To an airport still in infancy and facing the vicissitudes of growth, they offered on the part of its only two important patrons, a long-term guarantee of patronage and support and the commitment of participation in construction of new facilities. To insure for itself such advantages, City elected to proceed by contract rather than by the usual regulatory process in prescribing rates for common use facilities for these two airlines." (*City & County of San Francisco* v. *Western Air Lines, Inc.* (1962) 204 Cal.App.2d 105, 139 [22 Cal.Rptr. 216].)

An analogous situation exists in the instant case. District was formed with the express purpose of inducing appellants to locate within its area. To that end, District entered into the agreements here in issue in order to bind appellants to a firm obligation to purchase a specified amount of water and thereby obtained for itself the benefit of a long-term guarantee of patronage. District is bound to the obligation to which it agreed in order to obtain that guarantee. (See, *City Council* v. *Superior Court* (1960) 179 Cal.App.2d 389, 400-401 [3 Cal.Rptr. 796] and cases cited therein.)

Finally, with respect to the lower court's conclusion that appellants were not entitled to recover any sums paid by them pursuant to rates assessed by District, this issue was not before the court. In Louisiana-Pacific's complaint the second cause of action requested a declaration that the corporation was not obligated to pay a portion of certain capital expenditure incurred by District in modifying and expanding its facilities. The third cause of action for money had and received sought the return of money paid under protest for these capital expenditures. Inasmuch as appellant's second and third causes of action were severed without prejudice by a court-approved stipulation when Louisiana-Pacific's action was consolidated with Crown-Simpson's suit, the court could not properly rule on those counts.

The judgment is reversed.

Rouse, J., concurred.

**GRODIN, P. J.,** Concurring and Dissenting.—I agree with the majority that the three pertinent provisions of the Water District Act—Water Code sections 71614 (authorizing a district to fix rates), 71616 (providing criteria for rate fixing), and 71592 (authorizing the district to enter into contracts)—should be interpreted in such a way as to harmonize them in accordance with what appears to be the overall intent of the Legislature. It appears to me, however, that the majority's interpretation—which leaves districts free to enter into long-term contracts establishing rates without regard to the criteria set forth in section 71616—produces a dissonant result. The message conveyed by the majority's opinion is that the governing board of a water district, approached by a potential user interested in conducting business within the district's jurisdiction, is free to enter into a contract with the user establishing rates for whatever number of years it chooses (in this case, 43 years), and without regard to the relationship between the rates so established and the district's operating expenses, or amounts required for repairs and depreciation, surplus for expansion, payments on bonded debts, and repayment of advances. The Legislature must have intended the criteria contained in section 71616 to operate as a limitation upon the district's rate-fixing discretion. If that limitation can be avoided through the device of a contract, the legislative intent is defeated.

In my view, a more harmonious accommodation among the three sections can be achieved by acknowledging the district's authority to establish rates through contract, as provided in section 71592, so long as the terms of the contract are in accord, "so far as practicable," with the criteria provided in section 71616. At least, the district's governing body should be held to a standard of substantial compliance with those guidelines when it chooses to commit the district's resources over a period of time.

I therefore concur in the court's decision to reverse, but I would include directions on remand that the trial court entertain evidence and make findings as to whether or not the contract in question is in compliance, so far as practicable, with the criteria set forth in section 71616.

A petition for a rehearing was denied December 2, 1982. Grodin, J., was of the opinion that the petition should be granted. The petition of respondent Humboldt Bay Municipal Water District for a hearing by the Supreme Court was denied December 29, 1982.