STATE, Respondent, *v.* EBEL, Appellant.

(No. 6,980.)

(Submitted September 19, 1932.   Decided October 24, 1932.)

[15 Pac. (2d) 233.]

414

*Mr. C. R. Stranahan,* for Appellant, submitted a brief and argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. Harry L. Burns,* County Attorney of Blaine County, for the State, submitted a brief; *Mr. Burns* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

This defendant, Walter Ebel, was convicted in Blaine county of the crime of burglary in the daytime, committed, it is charged, by the entry of a certain building, to wit, "a certain sheep wagon * * * being then and there the dwelling house of one James Sullivan," with felonious intent.

The defendant has appealed from the judgment of conviction; numerous assignments of error are made, but those urged here are that the information on file does not state a public offense and that the evidence adduced is insufficient to warrant the verdict rendered.

1. The challenge to the sufficiency of the information, raised by objection to the introduction of any evidence, is that larceny from a "sheep wagon," if proved, does not fall within the definition of burglary. Under this head (a) much of counsel's brief is devoted to argument and citation of authorities as to what does and what does not constitute a "dwelling house"; (b) it is urged that a "building" must have permanency of location, without which (c) the accused might be subjected to a succession of prosecutions for the same offense to which he could not successfully plead former jeopardy.

Common-law "burglary" is defined as the breaking and entering of the dwelling-house of another, in the night-time, with the intent to commit a felony therein, but the controlling definition here is: "Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse, or other building, tent, vessel, railroad car, with intent to commit grand or petit larceny or any felony, is guilty of burglary." "Every burglary committed in the nighttime is burglary in the first degree, and every burglary committed in the daytime is burglary in the second degree." (Secs. 11346, 11347, Rev. Codes 1921.)

(a) The manner in which the foregoing statutory provisions modify the common-law definition is clearly pointed out by the supreme court of California in passing on section 459 of the Penal Code of California, as it existed prior to 1913, when it was identical with our section 11346 above. "While the language of the statute might have been made more definite and certain by employing words in common use, it could not well be made more comprehensive, and we think that the absence of more particular terms of description indicates an intention, on the part of the legislature, to include every kind of buildings or structures 'housed in' or roofed, regardless of the fact whether they are at the time, or ever have been, inhabited by members of the human family. A house, in the sense of the statute, is any structure which has walls on all sides and is covered by a roof." (*People* v. *Stickman,* 34 Cal. 244.) The element of human habitation was deliberately left out of our definition in declaring that the entry, with the intent described, into "any house * * * or any other building" is burglary, and it is said that a building may fall within the statutory definition, although when the statute was enacted, no such building as that described was known to the state. (*State* v. *Bishop,* 51 Vt. 287, 31 Am. Rep. 690.)

Here we have "a structure which has walls on all sides and is covered by a roof"—a house, a building.

(b) But it is urged that the "sheep wagon" does not come within the statute because the structure is erected, not upon

the ground, but upon a wagon and can be moved from place to place. On this point counsel relies chiefly upon the decision in *Williamson* v. *State*, 39 Tex. Cr. 60, 73 Am. St. Rep. 901, 44 S. W. 1107, 1108, wherein a "header box" on wheels, designed to travel with a heading machine for the reception of headed grain, was held to be not a "house" within the meaning of the Texas statute. There it is said by way of argument that the "box" on wheels had "no permanency of location"; but it is further said that it was not intended for habitation "or other purposes for which houses are ordinarily used," and, as showing that the court did not consider the first objection controlling, it declared: "We would not be understood as holding that it is absolutely necessary that the structure, in order to be considered a house, should be fixed to the soil, or that because it is portable it would not be considered a house." The controlling feature of the case is that the header box was not intended for any of the ordinary uses to which a house or building was put; it differed from the ordinary wagon used for hauling grain only in that it was fitted, for convenience, with a particular kind of box, lower on the one side than the other, and was covered with canvas to protect the heads of grain.

This is in conformity with the general rule that a structure, to be termed a building, must have been erected for the purpose of habitation by humans or animals, or for some purpose of trade, manufacture or the housing of goods and chattels. (*Favro* v. *State*, 39 Tex. Cr. 452, 73 Am. St. Rep. 950, 46 S. W. 932; *Sacks* v. *Legg*, 219 Ill. App. 144; *City of Concord* v. *Morgan*, 74 N. H. 32, 64 Atl. 725.)

While a "building" is usually real property, it may be personal property. (*Wells, Fargo & Co.* v. *Jersey City*, (D. C.) 207 Fed. 871.)

It has been held that the familiar "lunch wagon" is a building. (*Town of Montclair* v. *Amend*, (N. J. Sup.) 68 Atl. 1067.)

Here we have a like structure, erected for the purpose of habitation and the housing of the goods and chattels of the

sheep-herder, inclosed within four walls and roofed over and meets all the requirements of the definitions given of a "building."

(c) While Sullivan's employer owned a number of such portable houses, the information meets the requirement of definiteness and certainty of description, in that it describes the particular structure as that assigned to the man Sullivan as a dwelling-house; the defendant is in no danger of being put again in jeopardy for the same alleged entry even though the sheep wagon should be moved to another location.

To hold that the verdict and judgment should be set aside because the house entered was set on wheels would be extremely technical, and on this phase of the case we quote with approval the following from *State* v. *Bishop,* above: "Names change often with the habits and customs of the people; it is not so important to determine the *name,* as the *thing,* wherein burglary, by the statute, may be committed. That subtle astuteness that would discover a difference where none exists, and would find a way of escape * * * through narrow crevices of the law, serves no useful purpose. When one is charged with crime in plain language, and convicted by honest men upon legal evidence, it is better that he work out the penalty to the relief of the public and the safety of the state."

The information charges burglary as defined by our statute.

2. The evidence on which the jury returned its verdict of guilty is substantially as follows:

For some time prior to August 15, 1930, the defendant Walter Ebel had been assisting A. H. Benz in the harvest field, but on that day "heading" was halted on account of rain, and Ebel decided to go to his home some ten miles distant over the "Bagan" road; he left the Benz place some time after 2:30 P. M. and arrived home about 5 P. M.; he drove through his father's place just before reaching home.

It seems that there were two ways south of the Benz ranch, one through the Richmond ranch, the other not. Richmond and his wife testified that Ebel went through their place; he swore that he did not.

James Sullivan was employed as sheep-herder for Ray Runyon and lived in a sheep wagon which had been stationed, for more than three weeks, a short distance from the Bagan road between the Richmond place and Jacob Ebel's place.

No one saw Ebel leave the Benz place; Benz and others left about 2 P. M., at which time Ebel was changing the oil in his Whippet coupe; he then had no chains on the car. The coupe was practically new.

One Delford Brinkman testified that, at about 4 P. M. he saw a "new" coupe leave the road and cross the field to the sheep wagon; he was too far away to see who was in it. Sullivan also saw the coupe drive to the sheep wagon while he was some distance away; it stayed at the wagon for about twenty minutes; he watched the car drive back to the road and proceed in the direction of defendant's home.

Sullivan returned to the wagon about 7:30 when he discovered the cupboards therein open and practically all of his "grub" recently delivered at the wagon, including a pail of lard, a slab of bacon and a box of prunes, gone. At the time he thought the marauder had also taken certain wearing apparel, but later found that he was mistaken as to this. The tracks left by the car at the wagon were plain in the mud; they showed that the car had chains on.

Sullivan further testified that the wagon had been entered three weeks before the 15th of August, at which time foodstuffs and a comb had been taken.

On the morning of August 17 Sullivan, with Sheriff Fleming, armed with a warrant to search the Jacob Ebel home which did not mention groceries but described the wearing apparel, followed the tracks of the car that had been at the wagon to the road, down the road to the Jacob Ebel home, and from there to the home of the defendant, where chains seem to have been taken off it and mud knocked off the chains. The defendant admitted that he traveled the route described, but swore that he had no chains on his car. The sheriff testified that the tracks were plain in the mud and were easy to follow because made by the only car that had traveled that route

while the ground was muddy, which it was on the afternoon of August 15. The sheriff testified that he "picked up" the tracks near the Richmond house and traced them to the wagon.

Searching defendant's house the sheriff took therefrom some canned goods, a side of bacon, a box of prunes and a comb. No motion to suppress this evidence, as having been obtained illegally, was made. As there were no identifying marks on the groceries, witnesses for the state could only testify that they were identical with the articles stolen from the wagon. Mrs. Ebel and Jacob Ebel testified that those groceries were obtained by the former from the latter.

Leaving the Ebel home, the sheriff and Sullivan went to the Benz place, where Ebel was working, where, according to their testimony, the defendant told them that he would "settle" or "fix it up" with Ray Runyon, but was told that he would not be permitted to do so.

Sullivan testified that, at a later date, while Ebel was held under a complaint charging that he *broke* and entered the wagon for the purpose of stealing the wearing apparel, he had a conversation with Ebel in which the latter said that he could not be convicted because he did not break into the wagon, that it was not locked, and that he did not take Sullivan's clothes.

At the opening of the trial, counsel for defendant stated that, unless a stipulation could be secured respecting the testimony of one Walter Hammon, then out of the state, he would ask for a continuance. The county attorney thereupon stipulated that, if Hammon was present he would testify that he was with the defendant on August 15, up to the time the latter left his father's place at about 4:30 P. M., and that "he was not at or near * * * the sheep wagon." At the close of the trial this stipulation was read to the jury, whereupon the sheriff was called in rebuttal and, without objection on the ground that no proper foundation had been laid for the impeachment of the witness, testified that, at the Benz place, "on or about August 17," no one else being present, he had had a conversation with Hammon in which he asked the ab-

sent witness "if he was with Ebel yesterday in the car," to which question Hammon answered, "No."

The attempted identification of the groceries may not have been sufficient to warrant a conviction, had the defendant been charged with larceny, but on a prosecution for burglary it is not necessary to prove that a larceny was committed; the gravamen of the offense being the entry with the intent to commit larceny, or some other crime, as declared by the statute. (*Wood* v. *State*, 46 Ga. 322.) The fact that property, identical with that taken from the wagon when a burglary was in fact committed, was found in the defendant's possession shortly after the burglary, was a circumstance to be taken into consideration by the jury along with all other facts and circumstances shown and tending to prove that the accused did enter the building described with felonious intent. There can be no question but that the party who did enter the wagon did so with the intent to commit larceny and did commit burglary; the question presented, therefore, was merely as to whether or not the evidence adduced proved that the accused was the man who stopped at and entered the wagon.

The additional facts and circumstances show that the defendant's trip home from the Benz place coincided with that of the burglar; the burglar drove a new coupe, so did the defendant, and there was substantial evidence to the effect that but one car traveled the route which defendant admitted he traveled on the afternoon of the burglary; that car was driven by the man who stopped at and entered the sheep wagon. The car that stopped at the wagon had chains on; it stopped at the home of defendant's father, as did defendant, and then proceeded to defendant's home, where the chains were removed in front of defendant's house.

The evidence is sufficient to meet the requirements as to proof of a crime by circumstantial evidence, to-wit, that the criminatory circumstances must be consistent with each other and point so clearly to the guilt of the accused as to be inconsistent with any rational hypothesis other than his guilt.

(*State* v. *Riggs*, 61 Mont. 25, 201 Pac. 272; *State* v. *Hood*, 89 Mont. 432, 298 Pac. 354.)

It is not a "rational hypothesis" that defendant's car made no tracks on a muddy road while those made by the burglar were plain and easy to follow, or that a stranger would have stopped at the very places where the defendant stopped and finally removed the chains from his car in front of defendant's house. The criminatory circumstances are consistent with each other and point clearly to the defendant's guilt. Further the defendant's subsequent actions and declarations tend to support the conclusion of guilt.

3. The matter of the introduction of the comb in evidence, ▮▮▮▮▮ and testimony to the effect that it was taken from the wagon at a prior date, present a different question. The identification of the comb was more positive than that of the groceries; Sullivan testified "that is my comb," and one Wisch stated: "I owned that comb and I gave it to James Sullivan." It was an odd comb; neither witness had ever seen one like it. On cross-examination, it is true, each of these witnesses admitted that there were probably many combs identical with the one in evidence and that he could but say that it was the kind of comb he had owned; however, this admission went only to the weight of the testimony.

This evidence, believed by the jury, would prove the possession, by the person from whom it was taken, of stolen property, but, as the comb was claimed by defendant's wife as a gift from her sister, it is at least doubtful whether the testimony proved possession by the accused of recently stolen property. However, conceding for the sake of argument that the evidence showed that Sullivan's comb was found in Ebel's possession, that fact alone would not render the evidence admissible. The comb was not taken at the time of the burglary with which the defendant was accused, but was introduced as a part of the evidence of the commission of a former like crime, the only other evidence of which is Sullivan's statement that his sheep wagon had also been entered and property taken

therefrom at a time some three weeks prior to the date of the entry with which defendant was accused.

Objection was interposed to the admission of this statement, but was overruled after the county attorney had conceded it was well taken, but promised to "connect it up," and that, if he did not, the testimony would be stricken. No attempt was thereafter made to connect the defendant with the former crime, other than by the introduction of the comb in evidence; the testimony was not stricken and the case went to the jury carrying the strong implication that the defendant had committed, not only the crime charged, but a former burglary of the same "building," thus greatly strengthening the state's case. This, of course, was permissible, provided this supplemental evidence of guilt was admissible.

The general rule is that the defendant in a criminal trial can be convicted only upon proof of the single crime charged and evidence of the commission of other crimes is inadmissible. It is said that: "From the time when advancing civilization began to recognize that the purpose and end of a criminal trial is as much to discharge the innocent accused as to punish the guilty, it has been held that evidence against him should be confined to the very offense charged and that neither general bad character nor commission of other specific disconnected acts, whether criminal or merely meretricious, could be proved against him. This was predicated on the fundamental principle of justice that the bad man no more than the good ought to be convicted of a crime not committed by him." (*Paulson* v. *State*, 118 Wis. 89, 94 N. W. 771, 774.)

In a note (2 Jones' Commentaries on Evidence, 2d ed., 1158) it is said that the cases in which overzealous prosecutors have trespassed this rule, so that the appellate courts have had occasion to give it reiteration, are almost without number; many thereof are cited. Such evidence tends "to draw away the minds of the jurors from the real point on which their verdict is sought, and to excite prejudice, and mislead them." (*People* v. *Sharp*, 107 N. Y. 427, 1 Am. St. Rep. 851, 14 N. E. 319, 340.)

This rule is, however, subject to the well-established exception that evidence of other like crimes, committed by the accused, at or about the same time, is admissible for the purpose, and only for the purpose, of establishing certain elements of the crime charged and thus tending to prove that crime, such as motive, intent, absence of mistake or accident, a common scheme or plan to commit a series of related crimes, or the identity of the accused. (2 Jones' Commentaries on Evidence, 2d ed., 1174.) This exception is recognized in this jurisdiction. (*State* v. *Hall*, 45 Mont. 498, 125 Pac. 639; *State* v. *Hill*, 46 Mont. 24, 126 Pac. 41; *State* v. *Vinn*, 50 Mont. 27, 144 Pac. 773; *State* v. *Wyman*, 56 Mont. 600, 186 Pac. 1; *State* v. *Groom*, 89 Mont. 447, 300 Pac. 226.)

However, to render such evidence admissible, it must be shown that it substantially establishes the defendant's guilt as to such other crime, although the proof need not go so far as to show such guilt beyond a reasonable doubt (*State* v. *Hyde*, 234 Mo. 200, Ann. Cas. 1912D, 191, 136 S. W. 316; *State* v. *Meininger*, 306 Mo. 675, 268 S. W. 71), or, in other words, it must be shown with reasonable certainty that the accused committed the other crime (*Fountain* v. *State*, 90 Tex. Cr. 474, 241 S. W. 489).

The rule most favorable to the state is that "the evidence as to the other similar crimes must at least make out a *prima facie* case that such other crimes have been committed by the defendant." (*State* v. *Jones*, 27 Wyo. 46, 191 Pac. 1075, 1077.)

If we assume that the comb in question was found in the defendant's possession, that fact alone is not enough to meet the requirement of the most favorable rule above. Mere possession of property recently stolen is not alone sufficient to convict the possessor of the crime of larceny, although it is "a strong circumstance indicating guilt." (*State* v. *Mullins*, 55 Mont. 95, 173 Pac. 788; *State* v. *Sparks*, 40 Mont. 82, 135 Am. St. Rep. 608, 19 Ann. Cas. 1279, 105 Pac. 87; *State* v. *Wells*, 33 Mont. 291, 83 Pac. 476.)

Proof of possession of recently stolen property is less effective in a burglary case than on a charge of larceny, for, even

absolute proof of a larceny, without proof of entry with the intent, at the time of entry, to commit larceny, is insufficient to prove burglary. (*State* v. *Green,* 15 Mont. 424, 39 Pac. 322.)

The evidence admitted as to a former crime was insufficient to prove a larceny and wholly failed to connect the defendant with the former burglary, and its admission, under all of the authorities, constitutes reversible error.

The judgment is reversed and the cause remanded to the district court of Blaine county for a new trial.

MR. CHIEF JUSTICE CALLAWAY, MR. JUSTICE ANGSTMAN, HONORABLE JEREMIAH J. LYNCH and HONORABLE JOHN HURLY, District Judges, sitting respectively, in place of JUSTICES GALEN and FORD, disqualified, concur.