[Crim. No. 278.    Fifth Dist.    Aug. 17, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. DONALD
ALEXANDER, Defendant and Appellant.

Donald Alexander, in pro. per., and Benjamin M. Davis, under appointment by the District Court of Appeal, and Paul Briefer for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and Craig G. McIntosh, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J. — The defendant was charged in an amended information with two crimes and a prior conviction; count one accused him of violating section 593c of the Penal Code in that he maliciously interfered "with a Meter used in connection with a pipe or main maintained by proper authority for the purpose of transporting gas approximately Three (3) Miles South of Rio Vista Bridge" in Sacramento County; count two charged him with burglary in that he did "willfully and unlawfully and feloniously enter that certain Pumping Station owned by the Pacific Gas & Electric Company located approximately Three (3) Miles South of Rio Vista Bridge, with intent to commit theft therein." The prior conviction was for violation of section 593c of the Penal Code, malicious interference with a gas main alleged to have occurred in Colusa County on or about the 5th day of May, 1964, and which resulted in a prison sentence. The defendant entered a plea of not guilty to each of the two crimes charged in the amended information but admitted the prior conviction. By stipulation the defendant waived a jury trial, and the evidence produced by the People was heard by the judge alone as the trier of fact; the defense presented no evidence; the defendant was found guilty of both of the crimes charged, but the sen-

tence was restricted to burglary of the second degree only. (Pen. Code, § 654.)

The evidence of the anti-social acts of the defendant is overwhelming. Very early in the morning of August 4, 1965, the defendant and the young woman with whom he was living left their place of habitation in Berkeley for the purpose of getting some mercury. They went to the gas field near Rio Vista at which are located Peter Cook Gas Well No. 7 and other wells. At daybreak, the defendant entered the surface portion of the gas well property and went into a small building designed to guard from the weather that part of the apparatus needed to measure the flow of gas from the well. From the meter in this housing, the defendant removed several pounds of mercury necessarily used in the functioning of the meter and took it out to the car where the young woman was seated. He there poured the mercury taken by him into a larger jar. His companion, acting as a lookout, had noticed an automobile nearby on the river levee road and had told the defendant of this fact. It turned out that the car seen by her was occupied by two deputy sheriffs of Sacramento County, Officers Wilkins and Baroni, who had received a radio call to check the gas wells in the area.

The deputy sheriffs saw the defendant coming out of the gas well area and finally getting into the car in which the young woman was seated. The defendant's automobile took off at a rapid rate of speed, which at times was more than 100 miles per hour. The sheriffs pursued the fleeing car with their red light flashing and their siren turned on full blast. Finally, the defendant lost control of his car and it overturned; when he crawled from the wrecked vehicle, he was arrested. It turned out that the Fox Boro flow recorder at the well had been robbed of its mercury contents. The fluid metal was found near where the defendant's car had been parked during the burglary; it was ascertained that it had been dumped out on the ground by the defendant's woman companion. Not only did the police testify, but the woman herself took the stand; the illegal actions of the defendant were proven beyond all reasonable doubt.

Charles La Fever, Jr., a measurement inspector for the Pacific Gas & Electric Company, testified that that company was responsible for the maintenance and operation of the Fox Boro flow recorder and related equipment in the measurement of gas purchased by that company from the Amerada Petroleum Company. The recorder measured the flow from the well

to the transmission main of the Pacific Gas & Electric Company. Charts showing the measurement of the gas are changed every 24 hours. The charts are marked by two pens, one writing in blue and one in red ink, which are connected to a bearing which in turn is connected to a float in mercury. Without the component parts of the meter, properly assembled including the mercury, the instrument fails to show the actual gas purchased. At about 6:15 a.m. on the morning of the commission of the crimes, Mr. La Fever was called to the well and found that the mercury was missing from the Fox Boro recorder; the meter tube extends inside the housing hereinbefore referred to and the flow of gas passes through the pipe in connection with the meter and is then measured.

The appellant presents three arguments on the appeal:

1) The "chart house" from which the mercury was stolen was not a building or structure within the meaning of section 459 of the Penal Code;

2) The defendant did not violate section 593c of the Penal Code, as there was no interference with the flow of gas through any main or pipeline, and

3) Section 593c of the Penal Code is unconstitutional, because it is too vague.

Appellant argues that because the little meter building did not have walls completely covering the entire four sides of the housing, the building, therefore, was not such that it could be burglarized. The history of burglary shows a continuing process of enlarging the scope of the original common law crime of breaking into a "dwelling-mansion." This marked extension of the crime covers many variations. (See 1 Witkin, Cal. Crimes (1963) Crimes Against Property, § 455, pp. 417-418; 13 Am.Jur.2d, Burglary, §§ 1-7, pp. 320-324.) But it is frequently reiterated that a structure subject to being burglarized must have a roof and four walls. (*People* v. *Gibbons,* 206 Cal. 112 [273 P. 32].) However, it has been made clear that there are vital differences in many particulars between the old common law crime of burglary and the present offense. For example, the building or room does not have to be occupied (*People* v. *Stickman,* 34 Cal. 242; *People* v. *Searcy,* 153 Cal.App.2d 799 [314 P.2d 1002]); a chicken house (*People* v. *Coffee,* 52 Cal.App. 118 [198 P. 213]), a pop-corn stand (*People* v. *Burley,* 26 Cal.App.2d 213 [79 P.2d 148]), a telephone booth (*People* v. *Miller,* 95 Cal.App.2d 631 [213 P.2d 534]), and show cases connected with a store (*People* v. *Franco,* 79 Cal.App. 682 [250 P. 698]) have been held to be subject to

burglary; a garage is said to be a building in which burglary may be committed even though the door was wide open at the time of the alleged crime (*People* v. *Picaroni,* 131 Cal.App.2d 612 [281 P.2d 45]); and a powder magazine constructed in a hill side with a door that did not constitute the entire front wall may also be burglarized (*People* v. *Buyle,* 22 Cal.App.2d 143, 148 [70 P.2d 955].)

There is an alternative definition of a building subject to the commission of the crime approved in the *Buyle* case, *supra*; it is taken from the opinion in *Clark* v. *State,* 69 Wis. 203 [33 N.W. 436], which quotes Justice Paine in *La Crosse & Milwaukee R.R. Co.* v. *Vanderpool,* 11 Wis. 121 [78 Am.Dec. 691] as follows: " 'The well-understood meaning of the word [building] is a structure which has a capacity to contain, and is designed for the habitation of, man or animals, or the sheltering of property.' " ▮ Unquestionably, this four-walled construction with a roof and a wide doorway that was open was designed for sheltering property. The trial judge thought that it was subject to being burglarized. (See 9 Cal. Jur.2d, Burglary, § 8, pp. 457-460; 12 C.J.S., Burglary, § 23, p. 684; 78 A.L.R.2d 778.) It is not necessary, however, for us to pass on this question inasmuch as there can be no possible doubt that a reading of other portions of the Penal Code section relating to burglary establishes the crime. Section 459 of the Penal Code is in pertinent part as follows: "Every person who enters any . . . mine . . . with intent to commit grand or petit larceny . . . is guilty of burglary."

The gas well in question is included in the definition of a mine. Public Resources Code, section 2200, describes "mine" and "mineral" and explains "mineral" as including, for the purposes of the chapter, "all mineral products both metallic and nonmetallic, solid, liquid or gaseous. . . ."

In *People* v. *Silver,* 16 Cal.2d 714, 721 [108 P.2d 4], entry upon the surface premises of a mine with intent to commit theft was clearly held to be burglary: "There are many reasons for believing that the legislature intended by the addition of the words 'mine, or any underground portion thereof' to Penal Code, section 459, to make the entering of the surface of mining property with the intent to commit grand or petit larceny or any felony thereon burglary. One reason is undoubtedly the fact that much of the equipment used in the operation of a mine and mine plant of necessity must be left out of doors unenclosed by four walls and a roof. The greater portion of such equipment such as hose, pipes, flumes,

compressors, railway tracks and other tools from the nature of their use and because of their bulk cannot be kept in enclosed buildings. Another reason is that mining property is most frequently located in areas of relative isolation somewhat apart from thick settlements of population and the security of police protection. These circumstances obviously render such property susceptible of appropriation by those who are inclined to steal or misappropriate the property of others where the likelihood of their apprehension is slight or the penalty for their conduct is mild. It is probable, therefore, that the legislature, by the addition of the word 'mine' to the statute had in mind the imposing of this rather severe penalty to act as a deterrent to those who might be inclined to take advantage of the isolation of mining claims, especially in the absence of the owners thereof or of adequate police protection, to enter and appropriate property which may lay there in the open necessarily unenclosed.''

■ Appellant's second point is that, because there was no ''interference'' with the flow of gas, section 593c was not violated. That section provides: *''Every person who wilfully and maliciously breaks,* digs up, obstructs, interferes with, removes or injures any pipe or main erected, operated, or maintained by proper authority for the purpose of transporting, conveying or distributing gas for light, heat, power or any other purpose, or any part thereof, *or any* valve, *meter,* holder, compressor, machinery, appurtenance, equipment or apparatus *connected with any such main or pipeline, or used in connection with or affecting the operation thereof or the conveying of gas therethrough,* or shuts off, removes, obstructs, injures, or in any way interferes with any valve installed on, connected to, or operated in connection with any such main or pipeline, or controlling or affecting the flow of gas through any such main or pipeline, is guilty of a felony.'' (Italics added.)

The Fox Boro flow recorder which was impaired at Peter Cook No. 7 well is used to measure the flow of gas from the well into the Pacific Gas & Electric collection system and ultimately its transmission line; it is a meter. Removal of the mercury from the recorder interferes basically with the operation of the meter. Appellant is obviously attempting to interpret the code section in a too restrictive fashion; the acts of the defendant were forbidden by the express wording of the applicable code section.

■ The third argument advanced by appellant is equally fallacious. He attacks the constitutionality of section 593c,

claiming that the statute does not inform those who read it what is meant by "proper authority." It seems clear to us that the wording refers to the management of a standardized well and transmission line and that there cannot be any question that this particular complex of gas transmission apparatus, including the meter, was erected, operated and maintained by the "proper authority," that is to say, the Pacific Gas & Electric Company. Furthermore, the use of the phrase "used in connection with" does not offer any problem. The words are clear and the meaning is not veiled in doubt. As is said in section 4 of the Penal Code: ". . . All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice."

Appellant argues too narrowly that the meaning of the section is restricted to interference with the flow of gas through pipes or mains. As shown by the previous quotation of the section, the wilful and malicious interference with, removal or injury of any meter used in connection with gas transmission is a breach of the law, and there can be no question that this is exactly what was done by the defendant. There is nothing vague in the statute as it applies to appellant, and it seems obvious that he may not be heard to complain. (*In re Cregler,* 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305].)

The judgment is affirmed.

Stone, J., and McMurray, J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 14, 1966.

*Assigned by the Chairman of the Judicial Council.