[Crim. No. 3099. Fifth Dist. May 17, 1978.]

THE PEOPLE, Plaintiff and Appellant, v.
RONALD THOMAS MORELAND, Defendant and Respondent.

**COUNSEL**

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and Gary A. Binkerd, Deputy Attorneys General, for Plaintiff and Appellant.

Melvin W. Nitz, Public Defender, and Roger Harden Spaulding, Assistant Public Defender, for Defendant and Respondent.

**OPINION**

**TUTTLE, J.***—On December 28, 1976, defendant was charged in an information with a violation of section 246 of the Penal Code.[1] At that time section 246 read in pertinent part: "Any person who shall maliciously and wilfully discharge a firearm at an inhabited dwelling house or occupied building, is guilty of a felony, . . ." (Stats. 1949, ch. 698, § 1, p. 1200.)[2]

The question presented in this appeal is of fundamental significance: In determining whether defendant was properly charged with a violation of section 246, should the words "inhabited dwelling house or

---

*Assigned by the Chairperson of the Judicial Council.

[1]Hereafter, unless otherwise indicated, all statutory references are to sections of the Penal Code.

[2]Effective January 1, 1977, section 246 was amended to read in pertinent part: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house or occupied building, or occupied motor vehicle is guilty of a felony, . . ." (Stats. 1976, ch. 1119, § 1, p. 5023; see also Stats. 1976, ch. 1139, §§ 153, 350.2, pp. 5106, 5175.)

Then, effective January 1, 1978, section 246 again was amended to read in pertinent part: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle, inhabited house car, as defined in Section 362 of the Vehicle Code, or inhabited camper, as defined in Section 243 of the Vehicle Code, is guilty of a felony, . . . As used in this section, 'inhabited' means currently being used for dwelling purposes, whether occupied or not." (Stats. 1977, ch. 690, § 1, p. —.)

occupied building" as used in that section be construed to include a 24-foot Winnebago recreational vehicle equipped with living accommodations? Holding that these words did not warrant such a broad construction, the trial court granted defendant's motion to set aside the information for lack of probable cause (§ 995); the People appeal (§ 1238, subd. (a)(1)).

The evidence received at the preliminary examination may be summarized as follows: On the evening of October 16, 1976, in the Town of Dunlap, Fresno County, defendant was at the Dunlap Inn where he quarreled with several customers who were friends of William Lindsey. The dispute occurred in the presence of Lindsey and commenced when Lindsey's woman friend denied defendant's request for a ride home.

Later, Lindsey drove his 24-foot Winnebago recreational vehicle away from the inn; he was accompanied by his friends. He parked nearby for the night on private premises where he customarily parked on weekends; after his friends left Lindsey connected the electrical supply. At about 10:30 p.m., two shotgun blasts were fired into the Winnebago while Lindsey was inside. Defendant was arrested for the shooting and charged with violating section 246.

This would be an easy case if we were called upon to decide whether or not a reasonable man firing a gun into an occupied recreational vehicle would believe that he was breaking some law and that, if apprehended, he would go to jail, unless the prosecutor blundered. Admittedly, defendant is accused of serious wrongdoing. But our job is not to assess the abstract wrongfulness of defendant's acts, but rather to determine whether these acts violate the statute under which the prosecutor elected to proceed.

While we agree that penal statutes " ' ". . . should not be frittered away by niceties and refinements at war with the practical administration of justice, . . ." ' " (*People* v. *Crenshaw* (1946) 74 Cal.App.2d 26, 29 [167 P.2d 781]; accord *People* v. *Malcolm* (1975) 47 Cal.App.3d 217, 222 [120 Cal.Rptr. 667]), it appears that the "practical administration" urged by the Attorney General here is too result oriented; it would weaken principles vital to a free society simply to punish one bad actor under an inappropriate statute.

This is not quixotic quibbling; we deal here with principles fundamental to any government under law. A democratic state cannot jail people

for anti-social conduct, but only for acts declared by the legislature to be criminal.

"Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." (*McBoyle* v. *United States* (1931) 283 U.S. 25, 27 [75 L.Ed. 816, 818, 51 S.Ct. 340, 341].)

Applying this principle, Justice Holmes in *McBoyle* reversed the defendant's conviction of interstate transportation of a stolen motor vehicle because the defendant's conduct (i.e., interstate transportation of a stolen airplane) was not clearly covered by the statute under which the prosecution was brought; the statute prohibiting the interstate transportation of stolen motor vehicles defined the term "motor vehicle" as "an automobile, automobile truck, automobile wagon, motorcycle, or any other self-propelled vehicle not designed for running on rails." Although Justice Holmes felt that ". . . etymologically it is possible to use the word [vehicle] to signify a conveyance working on land, water or air, and sometimes legislation extends the use in that direction," (*supra,* 283 U.S. at p. 26 [75 L.Ed. at p. 818, 51 S.Ct. at p. 340]) he concluded that "[w]hen a rule of conduct is laid down in words that evoke in the common mind only the picture of vehicles moving on land, the statute should not be extended to aircraft, simply because it may seem to us that a similar policy applies, or upon the speculation that if the legislature had thought of it, very likely broader words would have been used" (*supra,* 283 U.S. at p. 27 [75 L.Ed. at pp. 818-819, 51 S.Ct. at p. 341]).

The rule relied upon by Justice Holmes in the *McBoyle* case was stated over 100 years earlier, in 1820, by Chief Justice Marshall: "It is the legislature, not the court, which is to define a crime, and ordain its punishment. [¶] . . . The intention of the legislature is to be collected from the words they employ." (*United States* v. *Wiltberger* (1820) 18 U.S. (5 Wheat.) 76, 95 [5 L.Ed. 37, 42].)

It might be said that these concepts were developed in earlier, more peaceful years, and are unrealistic and impractical in light of current crime rates and the need for rigorous law enforcement. But experience in the 20th century teaches us that such rules are not merely outmoded relics of 19th century liberalism, and we know that citizens must beware the

government which claims in the public interest the power to imprison those who do acts deemed to be deserving of punishment, even though the statute under which the prosecution is brought does not clearly proscribe such conduct.[3]

■ It is true that section 4 states that the common law rule of strict construction of criminal statutes does not apply to the California Penal Code, but the California Supreme Court has stated: "Although the Penal Code commands us to construe its provisions 'according to the fair import of their terms, with a view to effect its objects and to promote justice' [§ 4], it is clear the courts cannot go so far as to create an offense by enlarging a statute, by inserting or deleting words, or by giving the terms used false or unusual meanings. (*People* v. *Baker* (1968) 69 Cal.2d 44, 50 [69 Cal.Rptr. 595, 442 P.2d 675].) Penal statutes will not be made to reach beyond their plain intent; they include only those offenses coming clearly within the import of their language. (*DeMille* v. *American Fed. of Radio Artists* (1947) 31 Cal.2d 139, 156 [187 P.2d 769, 175 A.L.R. 382].) Indeed, 'Constructive crimes—crimes built up by courts with the aid of inference, implication, and strained interpretation—are repugnant to the spirit and letter of English and American criminal law.' (*Ex parte McNulty* (1888) 77 Cal. 164, 168 [19 P. 237].) [¶] . . . [A]s Chief Justice Marshall warned long ago, 'It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated.' (*United States* v. *Wiltberger* (1820) 18 U.S. (5 Wheat.) 76, 96 [5 L.Ed. 37, 42].)" (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 632 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

Accordingly, when the language used in a penal law is reasonably susceptible of two constructions, ordinarily that construction which is more favorable to the defendant will be adopted. (*In re Murdock* (1968) 68 Cal.2d 313, 317 [66 Cal.Rptr. 380, 437 P.2d 764]; *People* v. *Valentine*

---

[3]For example, on June 28, 1935, Germany promulgated the following statute which was hailed as "a mile-stone on the road to a National Socialist Penal Law": "Any person who commits an act which the law declares to be punishable or which is deserving of penalty according to the fundamental conceptions of a penal law and sound popular feeling, shall be punished. If there is no penal law directly covering an act, it shall be punished under the law of which the fundamental conception applied most nearly to said act." Further, article 16 of the Soviet Penal Code provides: "Where a socially dangerous act has not been expressly dealt with in the present code, the basis and limits of responsibility in respect thereof shall be determined in conformity with those articles of the code which deal with the crimes most closely resembling it." (See Michael & Weschler, Criminal Law and Its Administration (1940) p. 1080 and p. 1080, fn. 1.)

(1946) 28 Cal.2d 121, 143 [169 P.2d 1]; *People* v. *Ralph* (1944) 24 Cal.2d 575, 581 [150 P.2d 401].) The defendant is entitled to the benefit of every reasonable doubt, whether it arises out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute. (*Keeler* v. *Superior Court, supra,* 2 Cal.3d 619, 631; *People* v. *Valentine, supra,* 28 Cal.2d 121, 143; *People* v. *Ralph, supra,* 24 Cal.2d 575, 581.)

To avoid this rule, and to show that defendant here is not entitled to the benefit of such a reasonable doubt, the Attorney General must show that the words "inhabited dwelling house or occupied building" appearing in section 246 cannot reasonably be construed to exclude a 24-foot recreational vehicle, thus proving that the statute is not reasonably susceptible of two constructions. Such an argument founders upon the plain meaning of plain words. A recreational vehicle which is suitable and used for weekend trips, including overnight stays, does not come within either the common meaning or the dictionary definition of "house" or "building."[4]

---

[4]The word "house" commonly has been defined as:

"[A] structure intended or used for human habitation: a building that serves as one's residence or domicile esp. as contrasted with a place of business: a building containing living quarters for one or a few families" (Webster's New Internat. Dict. (3d ed. 1961) p. 1096, col. 1);

"[A] building in which people live; residence for human beings" (Random House Dict. of the Eng. Language (unabridged ed. 1973) p. 688, col. 2);

"A building intended for human habitation, especially one used as the residence of a family or single tenant" (Funk & Wagnalls, Standard Comprehensive Internat. Dict. (Bicentennial ed. 1973) p. 612, col. 1);

"A structure serving as a dwelling for one or several families" (American Heritage Dict. of the Eng. Language (1969) p. 638, col. 1);

"A building for human habitation; *esp.* a building that is the ordinary dwelling-place of a family" (5 Oxford Eng. Dict. (1933) p. 418, col. 1).

The word "building" commonly has been defined as:

"[A] constructed edifice designed to stand more or less permanently, covering a space of land, usu. covered by a roof and more or less completely enclosed by walls, and serving as a dwelling, storehouse, factory, shelter for animals, or other useful structure—*distinguished from structures not designed for occupancy (as fences or monuments) and from structures not intended for use in one place (as boats or trailers) even though subject to occupancy*" (italics added) (Webster's New Internat. Dict. (3d ed. 1961) p. 292, col. 1);

"[A] relatively permanent essentially boxlike construction having a roof and often windows and enclosing within its walls space, usually on more than one level, for any of a wide variety of activities, as living, entertaining, manufacturing, etc." (Random House Dict. of the Eng. Language (unabridged ed. 1973) p. 194, col. 3);

"An edifice for any use; that which is built, as a dwelling house, barn, etc." (Funk & Wagnalls Standard Comprehensive Internat. Dict. (Bicentennial ed. 1973) p. 175, col. 1);

"Something that is built; a structure; an edifice" (American Heritage Dict. of the Eng. Language (1960) p. 174, col. 1);

"That which is built; a structure, edifice: now a structure of the nature of a house built where it is to stand" (1 Oxford Eng. Dict. (1933) p. 1162, col. 2).

In short, we must decide whether, in the language of Justice Holmes, the "common world" would understand the words "inhabited dwelling house or occupied building" to mean a 24-foot recreational vehicle. Would the ordinary citizen believe that such a vehicle is a house or building, any more than he would believe a 24-foot cabin cruiser or sail boat, or a railroad car, or an airplane is a house or building, even if equipped with bunks and a kitchen? True, he would believe it was wrong and anti-social to fire a gun into it, but that is not the issue before this court. The question is not whether defendant did a bad thing and should have known that his conduct was morally wrong; the question is whether defendant did the act proscribed by the statute under which he was charged.

The answer, we believe, is clear; the case falls squarely within the reasoning of Justice Holmes in the *McBoyle* case. (*McBoyle* v. *United States, supra,* 283 U.S. 25 [75 L.Ed. 816, 51 S.Ct. 340].)

Not only would it be wrong to say that beyond a reasonable doubt a recreational vehicle is included within the phrase "inhabited dwelling house or occupied building," but it appears that at the time defendant allegedly violated section 246, the Legislature did not intend for a recreational vehicle to come within the ambit of that section.

When section 246 was enacted in 1949 its scope only extended to "inhabited dwelling house[s] or occupied building[s]." Effective January 1, 1977, the phrase "occupied motor vehicle" was added to the statute; thereafter, effective January 1, 1978, the words "inhabited house car, as defined in Section 362 of the Vehicle Code" and "inhabited camper, as defined in Section 243 of the Vehicle Code" were added to section 246. (See fn. 2, *ante,* at p. 14.)

Ordinarily, and there is nothing to suggest that this is not an ordinary case, the Legislature uses words for some reason and intends them to have some meaning. (*People* v. *Perkins* (1951) 37 Cal.2d 62, 63-64 [230 P.2d 353].) Where changes have been introduced to a statute by amendment it is not to be assumed that the changes were without design; by substantially amending a statute the Legislature demonstrates an intent to change the preexisting law. (*People* v. *Perkins, supra,* 37 Cal.2d 62, 64; *People* v. *Valentine, supra,* 28 Cal.2d 121, 142; *People* v. *Weitzel* (1927) 201 Cal. 116, 118-119 [255 P. 792, 52 A.L.R. 811].) Thus, not until January 1, 1977, did the Legislature intend for any type of vehicle to come within the ambit of section 246.

█ This conclusion is further supported by the fact that when the Legislature added the words "occupied motor vehicle" to section 246, it at the same time deleted the words "discharges a firearm" from subdivision (b) of section 23110 of the Vehicle Code, which prior to the deletion of those words proscribed the throwing of a substance or discharging of a firearm at a vehicle on a highway. █ Where a statute, with reference to one matter is amended to add a subject, the omission of such subject from a similar statute concerning a related matter, is significant to show that the Legislature intended a substantial change in the statute to which the addition occurred. (Cf. *People v. Valentine, supra,* 28 Cal.2d 121, 142.)

█ █ The Attorney General has suggested that this court should look to the language of subdivision 1 of section 460 as an aid in interpreting the statutory language in question. Subdivision 1 of section 460 reads "Every burglary of an inhabited dwelling house, trailer coach as defined by the Vehicle Code, or building committed in the nighttime, is burglary of the first degree."[5] However, the Attorney General has cited to this court cases interpreting the language of section 459, not subdivision 1 of section 460. Section 459 provides: "Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, railroad car, trailer coach, as defined in Section 635 of the Vehicle Code, any house car, as defined in Section 362 of the Vehicle Code, inhabited camper, as defined in Section 243 of the Vehicle Code, vehicle as defined by the Vehicle Code when the doors of such vehicle are locked, aircraft as defined by the Harbors and Navigation Code, mine or any underground portion thereof, with intent to commit grand or petit larceny or any felony is guilty of burglary. As used in this section, 'inhabited' means currently being used for dwelling purposes, whether occupied or not."

█ The language of section 459 is very broad and comprehensive, and it even encompasses structures that are not used for human habitation. (*People v. Stickman* (1867) 34 Cal. 242, 245; *People v. Searcy* (1957) 153 Cal.App.2d 799, 800 [314 P.2d 1002]; *People v. Coffee* (1921) 52 Cal.App. 118, 120 [198 P. 213].) The cases interpreting section 459 have correctly held that structures within the ambit of that statute can include structures that are not permanently affixed to realty. (*People v. Burley*

---

[5]The word "inhabited" contained in subdivision 1 of section 460 is applicable to and descriptive of "building" and "trailer coach" as well as "dwelling house." (*People v. Lewis* (1969) 274 Cal.App.2d 912, 917 [79 Cal.Rptr. 650]; *People v. Clinton* (1924) 70 Cal.App. 262, 264 [233 P. 78].)

(1938) 26 Cal.App.2d 213, 214-215 [79 P.2d 148] [a popcorn stand on wheels]; *People* v. *Coffee, supra,* 52 Cal.App. 118, 122, 123-124 [a chicken house constructed on skids].) As was pointed out in *People* v. *Burley, supra,* 26 Cal.App.2d 213, 215: "It should be noted that 'tent, vessel and railroad car' are included in the definition [of burglary in section 459], in which connection a 'tent' can scarcely be regarded as being permanently affixed to the realty." But the same broad, comprehensive language that permits such an interpretation of section 459 is absent from subdivision 1 of section 460.

The one case that has dealt with the more restrictive language of subdivision 1 of section 460 held that a caboose was neither an "inhabited dwelling house" nor an "inhabited building" within the meaning of subdivision 1 of section 460; the court observed that a caboose was a "railroad car." (*People* v. *Jones* (1926) 78 Cal.App. 683, 684-685 [248 P. 713].) ▮ We note that the words "railroad car" are expressly included in section 459, but are omitted from subdivision 1 of section 460. Such an omission would raise a reasonable inference that the Legislature did not intend for "railroad car[s]" to come within the ambit of subdivision 1 of section 460, even if they were inhabited. (See *People* v. *Valentine, supra,* 28 Cal.2d 121, 142.) Similarly, the words "trailer coach," "house car," "inhabited camper" and "[locked] vehicle" have been expressly included in section 459, but, except for "trailer coach," have been omitted from subdivision 1 of section 460. Such an omission also raises a reasonable inference that the Legislature did not intend for such vehicles, even if inhabited, to come within the scope of subdivision 1 of section 460, except for "trailer coach[es]" which are expressly included in that provision. In the instant case, the Attorney General's allusions to the language of subdivision 1 of section 460 is more of a hindrance to his position than an assistance.

▮ Since defendant's alleged conduct occurred before the January 1, 1977, change to section 246, this case is controlled by the language of section 246 as it read prior to that change. (See Pen. Code, § 3; 1 Witkin, Cal. Crimes (1963) §§ 9, 17, pp. 11, 20.) At the time in question section 246 merely proscribed the discharging of a firearm into an "inhabited dwelling house or occupied building." For the reasons stated above, a 24-foot Winnebago recreational vehicle is neither an "inhabited dwelling house" nor an "occupied building" within the meaning of section 246. It follows that the trial court was correct in granting defendant's section 995 motion.

The order setting aside the information is affirmed.

Franson, J., concurred.

**BROWN (G. A.), P. J.**—I dissent.

The narrow issue to be resolved is whether a 24-foot Winnebago motor home which was parked for the weekend near a residence on private property was "an inhabited dwelling house or occupied building" within the meaning of Penal Code section 246.[1] I conclude that at the very least it is properly classified as "an inhabited dwelling house."

The Winnebago motor home was equipped with sleeping accommodations, sitting area, kitchen area and a stove for cooking. Its owner habitually drove the unit on weekends to the foothills near Dunlap in Fresno County and parked it in the same location. On the weekend in question he followed his usual practice. The electrical umbilical was connected to an outside source and the curtains were closed. The owner and another person were using the Winnebago as a habitation when two shotgun blasts were discharged into the home at close range and from different angles.

Earlier in the evening the defendant had had disagreements with the owner's friends at a nearby inn where some shoving and pushing took place and had been denied a ride home in the Winnebago. Defendant was arrested after the shooting and charged with violating Penal Code section 246.

The proper interpretation of statutory language is a question of law for the appellate court, which is not constricted in this regard by the conclusions of the trial court. (Evid. Code, § 310; *Neal* v. *State of California* (1960) 55 Cal.2d 11, 17 [9 Cal.Rptr. 607, 357 P.2d 839] (cert. den., 365 U.S. 823 [5 L.Ed.2d 700, 81 S.Ct. 708].)

In construing the phrase "inhabited dwelling house or occupied building," the primal principle of statutory construction requires the

---

[1]Penal Code section 246 at the time of the events herein provided: "Any person who shall maliciously and wilfully discharge a firearm at an inhabited dwelling house or occupied building, is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison for not less than one or more than five years or by imprisonment in the county jail not exceeding one year."

ascertainment of the intent of the Legislature. (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) When, as here, there is no direct evidence of legislative intent, the court should turn first to the words of the enactment for the answer and may also rely upon extrinsic aids. (See *People* v. *Knowles* (1950) 35 Cal.2d 175, 182-183 [217 P.2d 1] (overruled on other grounds in *People* v. *Tribble* (1971) 4 Cal.3d 826, 831 [94 Cal.Rptr. 613, 484 P.2d 589]; cert. den., 340 U.S. 879 [95 L.Ed. 639, 71 S.Ct. 117]); *In re Miller* (1947) 31 Cal.2d 191, 198-199 [187 P.2d 722].)

It is also appropriate to observe that the statute "should be construed flexibly with the principal objective of discouraging the social evil which [the] statute was designed to prevent" (*People* v. *Malcolm* (1975) 47 Cal.App.3d 217, 223 [120 Cal.Rptr. 667], fn. omitted) and that "[t]he rule of the common law, that penal statutes are to be strictly construed, has no application to this [Penal] Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice." (Pen. Code, § 4; *People* v. *Haskins* (1960) 177 Cal.App.2d 84, 86-87 [2 Cal.Rptr. 34].)

The manifest intent of the Legislature in enacting Penal Code section 246 could have been nothing other than to protect the inhabitants of a structure designed or altered or equipped for human habitation and being used as such from being killed or injured by a missile from a firearm.[2]

This being the overriding discernible intent of the Legislature in enacting section 246, it is apparent that the mobility of the structure so designed and used for habitation is of little, if any, measurable significance. The inquiry therefore should be directed toward whether either case law or other principles of statutory interpretation preclude such a conclusion. I think not.

Turning first to the case law, no cases have been found which define the terms "inhabited dwelling house" or "occupied building" as they are used in section 246. Lacking such direct authority, it is agreed by both of the parties that it is appropriate to turn to the burglary statutes and the cases which interpret them. Penal Code section 460, subdivision 1,

---

[2]At the time of the offense herein Vehicle Code section 23110 prohibited the discharge of a firearm at a motor vehicle on the highway or occupant thereof, thus protecting persons in a motor home and other motorists from such criminal conduct while on the highway.

defining first degree burglary, uses the precise term "inhabited dwelling house . . . or building." The terms "house" and "building" are used in Penal Code section 459. In *People* v. *Chavira* (1970) 3 Cal.App.3d 988, 992 [83 Cal.Rptr. 851], the court looked for guidance to cases construing the burglary statute in order to interpret the meaning of words used in Penal Code section 246.

A review of those cases supports the view that the degree of mobility, whether self-propelled or not, does not prevent an inhabited or occupied structure from being classified as an inhabited dwelling or occupied building. Initially it is noted that the terms "house" and "building" have been given a liberal interpretation. Thus, in *People* v. *Stickman* (1867) 34 Cal. 242, 245, the court said: "A house, in the sense of the statute, is any structure which has walls on all sides and is covered by a roof." (In accord, *People* v. *Miller* (1950) 95 Cal.App.2d 631 [213 P.2d 534]; *People* v. *Buyle* (1937) 22 Cal.App.2d 143 [70 P.2d 955].) A building has been defined in *People* v. *Miller, supra,* 95 Cal.App.2d 631, 634, as " 'a structure which has capacity to contain, and is designed for the habitation of, man or animals, or the sheltering of property.' " Witkin, in 1 California Crimes (1963 ed.) section 452, page 415, stated that a building may be "any kind of structure if used as a habitation." Defining the word "building" in terms of its purpose and design, *People* v. *Alexander* (1966) 244 Cal.App.2d 301, 305 [53 Cal.Rptr. 65], states: " ' "The well-understood meaning of the word [building] is a structure which has a capacity to contain, and is designed for the habitation of, man or animals, or the sheltering of property." ' "

In *People* v. *Burley* (1938) 26 Cal.App.2d 213, 214-215 [79 P.2d 148], the court held that a mobile popcorn stand mounted on small wheels which was entirely enclosed was a building. The court said: "[T]here are no words in the statute to indicate a legislative intent to limit such offense to the unlawful entry of structures that are a part of the realty." Similarly, the following have been held to be included within the burglary statutes: Mobile chicken coop on skids (*People* v. *Coffee* (1921) 52 Cal.App. 118, 120-122 [198 P. 213]); passenger bus used as an office (*People* v. *McLaughlin* (1957) 156 Cal.App.2d 291, 296 [319 P.2d 365]); sheep wagon on wheels used by sheepherder as place of habitation (*State* v. *Ebel* (1932) 92 Mont. 413 [15 P.2d 233]); 40- or 50-foot mobile trailer home adapted for overnight accommodations and stored in a lot awaiting transport

(*Commonwealth* v. *Mayer* (1976) 240 Pa.Super. 181 [362 A.2d 407]; trailer used as office (*State* v. *Parsons* (1950) 70 Ariz. 399 [222 P.2d 637, 639]).[3]

The defendant relies upon *People* v. *Jones* (1926) 78 Cal.App. 683 [248 P. 713]. The structure at issue was a burglarized caboose hooked to and at the end of a train standing in a railroad yard. There is a paucity of facts stated in the opinion. The court, in conclusional terms and without citation of authority, held the caboose was not an "inhabited dwelling house or building" within the meaning of Penal Code section 460. It could well be that the holding in *Jones* can be reconciled with the aforecited cases on the ground that the caboose was not designed or customarily used for habitation of people or animals and not intended for ordinary uses for which a house or building is put. (See *People* v. *Alexander, supra,* 244 Cal.App.2d 301, 304-305; 1 Witkin, Cal. Crimes (1963 ed.) § 452, p. 415; *State* v. *Ebel, supra,* 92 Mont. 413 [15 P.2d 233, 234-235].) The court in *Jones* noted that a caboose is a "railroad car." A "railroad car" is expressly included in Penal Code section 459, whereas it is omitted from section 460. Such an omission would raise an inference that the Legislature did not intend section 460 to apply to the burglary of a caboose. In the present case there is no similar indication that the Legislature intended the terms in Penal Code section 246 to be narrowly construed. *Jones* is therefore distinguishable. Nevertheless, to the extent that the holding in *Jones* is inconsistent with the conclusions herein, I would decline to follow its teaching as being inconsistent with the other cases on the subject.

Inferentially supportive of my conclusion that mobility of a structure otherwise designed or converted and customarily used for human

---

[3]In noncriminal context the cases uniformly hold semimobile and mobile structures to be buildings. See, for example, *Pacific Gas & Elec. Co.* v. *Hacienda Mobile Home Park* (1975) 45 Cal.App.3d 519, 527 [119 Cal.Rptr. 559] (a mobile home or trailer is a building or structure as those two terms were used in a subject grant of easement); *Melton* v. *City of San Pablo* (1967) 252 Cal.App.2d 794, 803 [61 Cal.Rptr. 29] (bus used as a restaurant, utility lines connected, wheels on, tires inflated. Building subject to building code ordinance. "Once adapted to such a use, any characteristics the bus might otherwise have as a mobile transportation unit are, at least temporarily, suspended . . . ."); *Aetna Life Ins. Co.* v. *Aird* (5th Cir. 1939) 108 F.2d 136 (house trailer resting on jacks used for one week as dwelling was within provisions of accident insurance policy providing for double indemnity to one injured by the collapse of walls or burning of building); *Lower Merion Tp.* v. *Gallup* (1946) 158 Pa.Super. 572 [46 A.2d 35] (app. dism. 329 U.S. 669 [91 L.Ed. 591, 67 S.Ct. 92]) (vehicles for living or sleeping purposes are as much dwelling as any house built on a foundation and therefore are not mobile, and thus are subject to building codes); *Town of Montclair* v. *Amend* (1908) [68 A. 1067] (affd. 76 N.J.L. 625 [72 A. 360]) (familiar "lunch wagon" connected by utility lines was a building subject to local ordinance).

habitation does not prevent the structure from being classified as an "inhabited dwelling house or occupied building" is the definition of a "house car," which includes a Winnebago. That definition, contained in Vehicle Code section 362, reads: "A 'house car' is a motor vehicle originally designed, or permanently altered, and equipped for human habitation, or to which a camper has been permanently attached. . . ." It is apparent that by this definition the Legislature has equated the idea of mobility (a car) with a home (house).

The majority argues that because Penal Code section 246 was amended in 1976 to include "occupied motor vehicle,"[4] it must be presumed that a change in the law was intended, thus inferentially demonstrating that discharging a firearm at a motor home before the amendment was not prohibited. (*People* v. *Valentine* (1946) 28 Cal.2d 121, 142 [169 P.2d 1].) The Legislature indeed made a change in the law by the amendment, in that it included within the protections of Penal Code section 246 all occupied motor vehicles, whether used on or off the highway for human habitation. The Legislature also concurrently eliminated language in Vehicle Code section 23110[5] which had restricted the offense therein to making the discharge of a firearm at a vehicle on a highway punishable.

Nevertheless, the conclusion is not compelled from this amendment or the 1977 amendment that the Legislature had intended to exclude motor homes and trailers from being protected under the former provisions of

[4]Penal Code section 246 as amended in 1976 provides: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house or occupied building, or occupied motor vehicle is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison or by imprisonment in the county jail not exceeding one year."

Section 246 was further amended in 1977 to provide that: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle, inhabited house car, as defined in Section 362 of the Vehicle Code, or inhabited camper, as defined in Section 243 of the Vehicle Code, is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison, or by imprisonment in the county jail not exceeding one year. As used in this section, 'inhabited' means currently being used for dwelling purposes, whether occupied or not."

[5]Vehicle Code section 23110 provided at the time of the events herein:

"(a) Any person who throws any substance at a vehicle or any occupant thereof on a highway is guilty of a misdemeanor.

"(b) Any person who with intent to do great bodily injury maliciously and wilfully throws or projects any rock, brick, bottle, metal or other missile, or projects any other substance capable of doing serious bodily harm, or discharges a firearm at such vehicle or occupant thereof is guilty of a felony and upon conviction shall be punished by imprisonment for not less than one year or more than five years in the state prison."

The 1976 amendment deleted the language "discharges a firearm."

section 246. With equal logic it can be rationally concluded that the Legislature must have intended insofar as motor homes are concerned that the amendment was a legislative reaffirmance and clarification of existing law. (*People* v. *Haskins* (1960) 177 Cal.App.2d 84, 87 [2 Cal.Rptr. 34].)

Corroboration of this view is found in the Legislature's use of the term "motor vehicle" rather than "vehicle" when amending the statute in 1976 and in the reenactment of the language "inhabited dwelling house or occupied building." The reenactment establishes that the terms of the statute have the same meaning as judicial decisions construing that language, of which decisions the Legislature is presumed to be aware. (Witkin, Cal. Crimes (1975 supp.) § 18, p. 24.) If the language "inhabited dwelling house or occupied building" is not construed to include habitable mobile vehicles which are not self-propelled and thus are not "motor vehicles" (Veh. Code, § 415), a whole class of structures defined as trailer coaches (Veh. Code, § 635) would remain excluded from protection under the pre-1977 law. I cannot ascribe such an absurd intent to the Legislature.

The principal opinion also relies upon the principles of interpretation repeated in *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420], where it is said: "It is the policy of this state to construe a penal statute as favorably to the defendant as its language and the circumstances of its application may reasonably permit; just as in the case of a question of fact, the defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in a statute. [Citation.]" (See *People* v. *Valentine, supra,* 28 Cal.2d 121, 143.) On its face this principle seems to be in conflict with the statutory rule set forth in Penal Code section 4, to the effect that the rule of the common law that penal statutes are to be strictly construed, has no application and that all provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice. Upon closer analysis, however, there is no conflict as applied to this case. By its terms, the principle of *Keeler* applies to the interpretation of the words and phrases in a statute when the "language and the circumstances of its application . . . reasonably permit; . . ." (2 Cal.3d at p. 631.) In my view, the term "inhabited dwelling house" under the circumstances herein does not reasonably permit any interpretation other than that I have espoused. I do not believe any reasonable person could possibly believe he was not violating the statute by discharging a weapon into a known inhabited

motor home being used as a dwelling. To find otherwise would lead to the absurd conclusion that the Legislature prior to 1966 did not intend to make the actions at issue in this case punishable under this law. Moreover, the principle of *Keeler* does not mean that "the language of a statute must be stretched and strained beyond the limitation of reason." (*Downing* v. *Municipal Court* (1948) 88 Cal.App.2d 345, 349 [198 P.2d 923].) As was said in *People* v. *Crenshaw* (1946) 74 Cal.App.2d 26, 29 [167 P.2d 781], quoting from 2 Lewis' Sutherland Statutory Construction (2d ed.) section 528, page 981: " 'A penal statute should receive a reasonable and common sense construction, and "its force should not be frittered away by niceties and refinements at war with the practical administration of justice." The principle of strict construction does not allow a court to make that an offense which is not such by legislative enactment; but this does not exclude the application of common sense to the terms made use of in an act in order to avoid an absurdity which the legislature ought not to be presumed to have intended.' " (See *People* v. *Hallner* (1954) 43 Cal.2d 715, 721 [277 P.2d 393].)

In this regard, it is also noted in passing that the principle of *Keeler* and *Valentine* has caused the courts no problem in construing the identical language to include mobile and semi-mobile structures in the context of burglary statutes.

Finally, it must be observed that the majority's construction of the statute as it existed prior to amendment in 1976 would eliminate protection to occupants of a motor home after the vehicle left the highway, protection up to that point being afforded by Vehicle Code section 23110 as it then read. There is nothing inappropriate, inconsistent or incongruous in interpreting the two statutes (Veh. Code, § 23110, and Pen. Code, § 246) together and as a congruent whole for the purpose of affording protection to the occupants of a motor home while on the highway under the Vehicle Code and under the Penal Code while off the highway.

I would hold that the term "inhabited dwelling house" as used in section 246 of the Penal Code includes a Winnebago motor home being used for habitation when parked on private property, that a reasonable person in the position of the defendant would know that the conduct in which he engaged was prohibited by the statute, and that considering the purpose of the statute, the language of the statute and other circum-

stances no other conclusion would be reasonable. Having so held, it would be unnecessary to determine whether a motor home is an occupied building.

I would reverse the order.